**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

| | |
|---|---|
| MICHAEL L. VICKERS; SHERIFF BRAD COE, in his official capacity; KINNEY COUNTY, TEXAS; and ATASCOSA COUNTY, TEXAS.<br><br><div align="center">Plaintiffs,</div><br><div align="center">v.</div><br>JOSEPH R. BIDEN, JR., President, in his official capacity; UNITED STATES OF AMERICA; U.S. DEP'T OF HOMELAND SECURITY; U.S. CUSTOMS & BORDER PROTECTION; U.S. IMMIGRATION & CUSTOMS ENFORCEMENT; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; ALEJANDRO MAYORKAS, Secretary, U.S. Dep't of Homeland Security, in his official capacity; TROY MILLER, Senior Official performing the duties of the Commissioner, U.S. Customs & Border Protection, in his official capacity; PATRICK J. LECHLEITNER, Deputy Director and Senior Official performing the duties of the Director, U.S. Immigration & Customs Enforcement, in his official capacity; UR M. JADDOU, Director, U.S. Citizenship and Immigration Services, in her official capacity,<br><br><div align="center">Defendants.</div> | Civil Action No. _____ |

**<u>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF</u>**

## I.    INTRODUCTION

1.      With full awareness of the likely consequences, Defendants have adopted unlawful policies that, working in concert, have frustrated Congress's purposes in the immigration laws. Congress has passed numerous laws aimed at achieving operational control of the border, defined as zero illegal entries. But Defendants' policies, issued under the authority of these laws, are calculated to result in, and have resulted in, the current, massive flood of illegal entries by foreign nationals from around the world. Collectively, Defendants' actions constitute a violation of the Take Care Clause of the Constitution that is conceptually clear, historically unique, and actionable by those it especially harms.

2.      The Take Care Clause was written for our time. It declares that the President "shall take Care that the Laws be faithfully executed . . . ." U.S. Const. art. II, Sec. 3, cl. 4. The Clause imposes a duty upon the Executive while reinforcing the distinction between legislative and executive functions. That duty is breached by otherwise-unlawful actions the Executive takes that will likely result in the opposite of the ends Congress sought to pursue in the law, and that the Executive is fully aware will likely have that result. The Executive is not the lawmaker, and the Constitution prevents it from making war on the law by pursuing ends diametrically opposed to those of the law. Such a negation of Congress's policy choices is a form of Executive nullification of the law, and is of the essence of a failure to take care. Were it otherwise, Congress would find itself impotent, its legislative authority subject to veto by the maneuvers of a recalcitrant Executive.

3.      It has long been recognized that the power "to forbid the entrance of foreigners … or to admit them only in such cases and upon such conditions as it may see fit to prescribe" is an inherent sovereign prerogative entrusted exclusively to Congress. *Nishimura Ekiu v. United States*, 142 U.S. 651, 659 (1892); *see also Galvan v. Press*, 347 U.S. 522, 531 (1954) ("Policies pertaining to the entry of aliens and their right to remain here are . . . entrusted exclusively to Congress . . . ."). Exercising this sovereign prerogative, Congress has enacted a comprehensive and detailed statutory scheme regulating immigration, the purpose of which is to prevent and deter illegal immigration.

4.      Congress has charged the Department of Homeland Security ("DHS") with the responsibility of enforcing these immigration laws. For example, Congress conferred upon the DHS Secretary "the power and duty to control and guard the boundaries and borders of the United States against the illegal entry of aliens …." 8 U.S.C. § 1103(a)(5).

5.      Congress has created a comprehensive scheme governing the inspection and removal of illegal aliens who attempt to enter the United States without proper documentation. Central to this scheme is Congress's directive that such applicants for admission must be detained pending a final adjudication of their admissibility (or asylum claim) or ultimately their removal.

6.      Congress has only authorized two exceptions to this mandatory detention. First, Congress has granted DHS the authority to return certain aliens "arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States … to that territory pending a proceeding under section 1229a of this title,"

8 U.S.C. § 1225(b)(2)(C). This discretionary authority permits DHS to return certain aliens to contiguous territory in lieu of mandatory detention.

7.    Second, Congress has conferred upon the DHS Secretary the narrow authority to "parole into the United States temporarily under such conditions as he may prescribe *only on a case-by-case basis* for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States." 8 U.S.C. § 1182(d)(5)(A) (emphasis added).

8.    Congress has also directed the Secretary of Homeland Security to achieve and maintain operational control over the borders of the United States and has directed the Secretary to "construct reinforced fencing along not less than 700 miles of the southwest border where fencing would be most practical and effective and provide for the installation of additional physical barriers, roads, lighting, cameras, and sensors to gain operational control of the southwest border." Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), § 102(b)(1)(A), Pub. L. 104-208, 110 Stat. 3009-546, -554 (as amended and codified as a note to 8 U.S.C. § 1103).

9.    To facilitate construction of such physical infrastructure enhancements and reinforced fencing, Congress appropriated, in both FY 2020 and FY 2021, $1.375 billion for "construction of a barrier system along the southwest border," and provided that this money "shall only be available for barrier systems." Consolidated Appropriations Act, 2020, Pub. L. 116-93, Div. D, § 209(a)(1), 133 Stat. 2317, 2511 (2019); Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, Div. F, § 210, 134 Stat. 1182, 1456–57 (2020) (appropriating an equal amount "for the same purposes").

10. Immediately upon being sworn into office, the current administration has pursued immigration policies that are not only at odds with Congress's statutory scheme and directives but are objectively calculated to dismantle these proven border security programs or craft novel administrative processing "pathways" to permit inadmissible aliens to enter and remain inside the country. Indeed, Defendants have knowingly adopted numerous immigration policies in excess of their statutory authority that, working in concert, encourage and facilitate the entrance and release of record numbers of illegal aliens into the United States while simultaneously preventing the removal of the vast majority of aliens who are unlawfully present in the United States.

11. For example, although DHS had determined that physical barriers on the southwest border and the Migrant Protection Protocols ("MPP") (colloquially, the "Remain in Mexico policy") were extremely effective at preventing or reducing illegal immigration, immediately upon taking office, the Biden Administration paused construction of the border wall and suspended the MPP. It took these actions without considering the environmental impacts of these actions as required by the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, et seq.

12. DHS also paused all removals for 100 days and ultimately adopted an interior enforcement prioritization policy under the guise of prosecutorial discretion that directs immigration officers not to take enforcement actions against any alien deemed removable by statute unless additional discretionary aggravating factors are present.

13.     More recently, the administration has adopted several unlawful parole policies that would allow vast numbers of aliens with no valid entry documents to enter the country, receive instant work authorization, and qualify for public benefits.

14.     These programs exceed DHS's narrow parole authority and are not authorized by Congress. Congress limited the Secretary's authority to "parole into the United States temporarily under such conditions as he may prescribe only *on a case-by-case basis* for urgent humanitarian reasons or *significant public benefit* any alien applying for admission to the United States." 8 U.S.C. § 1182(d)(5)(A) (emphases added).

15.     Collectively, Defendants' actions signaled to potential border crossers—and to the human-trafficking and drug cartels that coordinate illegal border crossings—that the Administration is unwilling to secure our border. These actions have resulted in the ongoing, record-setting surge of migrants at the southern border. Indeed, the actions by the Administration reflect a conscious decision to cease effective immigration enforcement policies and to pursue a general policy of non-enforcement.

16.     In short, Defendants have not only completely abdicated their statutory responsibilities, allowed the southern border to be overrun, and abandoned their duty to take care that the laws be faithfully executed, but have adopted policies that run counter to the statutory scheme in the teeth of clear statutory commands to the contrary. Whatever it may mean to take care that the laws be faithfully executed, it simply cannot mean that the Executive branch may enact policies that create or promote the very conditions that Congress sought to combat through legislation. Defendants' non-

enforcement immigration policies are contrary to Congress's statutory scheme, and should be vacated and enjoined.

17.     These policies are a not only a wholesale abdication of the Executive's duty to enforce the law, but were adopted in contravention of the NEPA. NEPA requires each federal agency to identify and consider the environmental impacts of its proposed federal actions. Because Defendants adopted these policies and took these actions without first considering the environmental impacts of these actions, Defendants' non-enforcement policies should be vacated and enjoined.

## II.     THE PARTIES

18.     Plaintiff Dr. Michael Louis Vickers (Doc Vickers) is a doctor of veterinary medicine (DVM) and the owner of a ranch of approximately 1000 acres in Brooks County, Texas.  The ranch is approximately 70 miles north of the international border with Mexico.

19.     Plaintiff Brad Coe is the Sheriff of Kinney County, Texas, acting in his official capacity. The Kinney County Sheriff's Office is located at 109 North Street, Brackettville, Texas. The Sheriff's Office operates the Kinney County Jail, which can house 14 inmates and is used to detain individuals for the commission of crimes in Kinney County.

20.     Plaintiff Kinney County, Texas, is a county of 1,365 square miles with a population of 3,129 in the 2020 census. Kinney County shares 17 miles of border with Mexico and is located between Del Rio and Eagle Pass, Texas.

21.    Plaintiff Atascosa County, Texas, is a county of 1,221 square miles with a population of 48,981 in the 2020 census. Atascosa County is part of the San Antonio–New Braunfels metropolitan area.

22.    Defendant United States of America is the federal sovereign.

23.    Defendant Joseph R. Biden, Jr., is the President of the United States. He is sued in his official capacity only.

24.    Defendant U.S. Department of Homeland Security ("DHS") oversees Defendants U.S. Customs and Border Protection ("CBP"), U.S. Immigration and Customs Enforcement ("ICE"), and U.S. Citizenship and Immigration Services ("USCIS") as constituent agencies of DHS. DHS and its constituent agencies enforce the INA.

25.    Defendant Alejandro Mayorkas is the Secretary of DHS. He is sued in his official capacity only.

26.    Defendant Troy Miller is the Deputy Commissioner and Senior Official Performing the Duties of the Commissioner of CBP. He is sued in his official capacity only.

27.    Defendant Patrick J. Lechleitner is the Deputy Director and Senior Official Performing the Duties of the Director of ICE. He is sued in his official capacity only.

28.    Defendant Ur M. Jaddou is the Director of USCIS. She is sued in her official capacity only.

### III.    JURISDICTION AND VENUE

29.    The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1361, and the federal government has waived sovereign immunity in 5 U.S.C. § 702.

30.    The Court is authorized to award the requested declaratory and injunctive relief under 5 U.S.C. §§ 705-706, 28 U.S.C. §§ 1361, 2201-02, and the Constitution.

31.    Venue lies in federal district courts generally pursuant to 5 U.S.C. § 703 because the INA does not specify a special statutory review proceeding for this action, and venue lies in this district pursuant to 28 U.S.C. § 1391(e) because Plaintiff Dr. Vickers is a resident of this judicial district and a substantial part of the events, actions, or omissions giving rise to Plaintiffs' claims occurred in this District.

32.    An actual case or controversy exists between Plaintiffs and Defendants.

33.    Although the INA precludes courts from hearing certain claims "on behalf of any alien arising from the decision or action . . . to commence proceedings, adjudicate cases, or execute removal orders," 8 U.S.C. § 1252(g), that provision does not apply to this action because Plaintiffs are not suing "on behalf of any alien." *Id.*; *see also Texas v. United States*, 809 F.3d 134, 164 (5th Cir. 2015).

34.    Similarly, the jurisdictional bar at 8 U.S.C. § 1252(f)(1) does not apply to this action. Section 1252(f)(1) states:

> Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter . . . other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated.

DHS's parole authority does not fall within "part IV of this subchapter" and § 1252(f)(1) does not bar injunctive relief against unlawful parole policies. To the extent Plaintiffs' claims touch on provisions falling within "part IV of this subchapter," that is 8 U.S.C. §§ 1221-1232, Plaintiffs seek only declaratory relief or vacatur of unlawful policies under the APA, while preserving their right to seek injunctive relief before the Supreme Court.

35.    Plaintiffs possess standing to bring their claims relating to Defendants' abdication of their statutory duties.  In *United States v. Texas*, the Supreme Court held that the plaintiff states lacked standing to seek an injunction requiring the executive branch to arrest or prosecute more individuals.  However, the Court carved out five exceptions to its holding.  One of those exceptions concerns executive abdication of statutory duty.  In the words of the Court:

> *Third*, the standing calculus might change if the Executive Branch wholly abandoned its statutory responsibilities to make arrests or bring prosecutions.  Under the Administrative Procedure Act, a plaintiff arguably could obtain review of agency non-enforcement if an agency "has consciously and expressly adopted a general policy that is so extreme as to an abdication of its statutory responsibilities."  *Heckler v. Chaney*, 470 U.S. 821, at 833, n. 4 (1985) (internal quotation marks omitted); *see id.*, at 839 (Brennan, J., concurring); *cf.* 5 U.S.C. § 706(1). So too, an extreme case of nonenforcement arguably could exceed the bounds of enforcement discretion and support Article III standing.

*United States v. Texas*, 599 U.S. 670, 682-83 (2023) (emphasis in original). Such is the case here. Defendants have abdicated their duty to secure the border and have instead knowingly adopted policies that work at cross purposes to the law and have resulted in the unlawful entry by record numbers of aliens. *See*, *e.g.*, *Florida v. United States*, 660 F. Supp. 3d 1239, 1253 (N.D. Fla. 2023) (describing this administration's policies as "akin

to posting a flashing 'Come In, We're Open' sign"); *Texas v. DHS*, 2023 U.S. Dist. LEXIS 212676, *41-42 (W.D. Tex. Nov. 29, 2023) (describing "the utter failure" of federal defendants to fulfill their statutory duties to "deter, prevent, and halt unlawful entry into the United States" due to "practices that … directly contravene" those same statutory obligations).

## IV.    BACKGROUND

### A.    Statutory Framework

36.    Through the Immigration and Nationality Act ("INA"), Congress has established a comprehensive scheme governing the inspection and removal of illegal aliens who attempt to enter the United States without proper documentation or who remain here in violation of the law. Central to this scheme is Congress's directive that such applicants for admission must be detained pending a final adjudication of their admissibility (or asylum claim) or ultimately their removal. *See* 8 U.S.C. § 1225(b)(1) and (2).

37.    The INA mandates that all applicants for admission—defined as "alien[s] present in the United States who ha[ve] not been admitted"—"shall be inspected by immigration officers." 8 U.S.C. § 1225(a)(1), (3).

38.    Section 1225(b), which governs inspection of applicants for admissions, distinguishes between two classes of arriving aliens. The first class consists of aliens who either have no entry documents or who attempt to gain admission through

11

misrepresentation or fraud ("B-1 aliens"). 8 U.S.C. § 1225(b)(1)(A)(i).[1] The other class

consists of all other arriving aliens ("B-2 aliens"). 8 U.S.C. § 1225(b)(2)(A), (B)

(excluding B-1 aliens from definition of B-2 aliens).

39.    B-1 aliens are subject to mandatory detention and expedited removal. Such

aliens "shall be" ordered removed from the United States "without further hearing or

review unless the alien indicates either an intention to apply for asylum under section

1158 of this title or a fear of persecution." *See* 8 U.S.C. § 1225(b)(1)(A)(i). If an alien

claims a fear of persecution, the alien "shall be detained pending a final determination of

credible fear of persecution." *Id.* at § 1225(b)(1)(B)(iii)(IV). If the alien fails to establish

a credible fear of persecution, the alien "shall be detained … until removed." *Id.* Even if

the alien successfully establishes a credible fear of persecution, the alien remains subject

to mandatory detention until the asylum claim is finally adjudicated. *See id.* at

§ 1225(b)(1)(B)(ii) ("the alien shall be detained *for further consideration of the*

*application for asylum*") (emphasis added).

40.    Inadmissible B-2 aliens are similarly subject to mandatory detention

pending final adjudication of their admissibility. If, upon inspection, an immigration

officer determines that a B-2 alien "is not clearly and beyond a doubt entitled to be

admitted, the alien shall be detained *for a proceeding* under section 1229a of this title."

---

[1]  Section 1225(b)(1)(A)(i) refers to aliens who are "inadmissible under section 1182(a)(6)(C) or 1182(a)(7) of this title." Section 1182(a)(6)(C) describes aliens who seek a visa or admission through misrepresentation as inadmissible. Section 1182(a)(7), in turn, deems aliens with no valid entry document as inadmissible.

8 U.S.C. § 1225(b)(2)(A) (emphasis added). Such a proceeding refers to regular removal proceedings before an immigration judge. *See generally* 8 U.S.C. § 1229a.

41.    Accordingly, regardless of whether aliens fall within the B-1 or B-2 class of applicants for admission, aliens apprehended at the border are subject to mandatory detention pending a final determination of their admissibility or asylum claims. Indeed, Justice Alito has stated that the obligation imposed by 8 U.S.C. § 1225(b)(2)(A) is clearly mandatory: "The language of 8 U. S. C. §1225(b)(2)(A) is unequivocal. With narrow exceptions that are inapplicable here, it provides that every alien 'who is an applicant for admission' and who 'the examining immigration officer determines . . . is not clearly and beyond a doubt entitled to be admitted . . . *shall be detained* for a [removal] proceeding." *Biden v. Texas*, 142 S. Ct. 2528, 2553-54 (2022) (Alito, J., dissenting) (emphasis in Alito opinion). *See Jennings v. Rodriguez*, 138 S.Ct. 830, 837 (2018) ("Read most naturally, §§ 1225(b)(1) and (b)(2) … mandate detention of applicants for admission until certain proceedings have concluded.").

42.    Congress has only authorized two exceptions to this mandatory detention. First, Congress has granted DHS the authority to return certain aliens "arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States … to that territory pending a proceeding under section 1229a of this title," 8 U.S.C. § 1225(b)(2)(C). *See generally Texas v. Biden*, 20 F.4th 928, 993-98 (5th Cir. 2021) ("*Texas MPP*") (discussing the limited alternatives to mandatory detention under section 1225(b)(2)(A)), *rev'd on other grounds*, 142 S. Ct. 2528 (2022). This discretionary authority permits DHS to return certain aliens to contiguous territory in lieu

13

of mandatory detention. *Id.* at 995 ("Section 1225(b)(2)(C) then explains a permissible alternative to otherwise-mandatory detention.").

43.    Second, Congress has conferred upon the DHS Secretary the narrow authority to "parole into the United States temporarily under such conditions as he may prescribe *only on a case-by-case basis* for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States." 8 U.S.C. § 1182(d)(5)(A) (emphasis added).

44.    Congress has authorized no other exception to mandatory detention under section 1225(b)(1) and (2). For aliens who are not subjected to the contiguous territory return provision, the only INA-compliant options are detention pursuant to 1225(b)(1)-(2) or parole pursuant to 1182(d)(5).

45.    The current language in section 1182(d)(5)(A), including the "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit" limitation was added by section 602(a) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"),[2] "to limit the scope of the parole power and

---

[2] Title VI of division C of Pub. L. No. 104-208, 110 Stat. 3009, 3009-689; *see also* § 203(f) of the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102, 107-08 (providing that DHS "may not parole into the United States an alien who is a refugee unless [DHS] determines that compelling reasons in the public interest *with respect to that particular alien* require that the alien be paroled into the United States rather than be admitted as a refugee") (emphasis added).

prevent the executive branch from using it as a programmatic policy tool." *Texas MPP*, 20 F.4th at 947.[3]

46.     Parole of B-1 and B-2 aliens is further restricted by regulation. Pursuant to regulation, such aliens remain subject to mandatory detention under 8 U.S.C. § 1225(b) and parole of such aliens is governed by 8 C.F.R. § 212.5(b). 8 C.F.R. § 235.3(b)(4)(ii), (c). Under the regulation governing parole, parole of such aliens is limited to those who have serious medical conditions, are pregnant, are minors, who will be a witness in a judicial, administrative, or legislative proceeding, or whose continued detention is not in the public interest as determined by an authorized official. *See* 8 C.F.R. § 212.5(b).

47.     Nothing in the INA or relevant regulations authorizes Defendants to "parole aliens *en masse*" or otherwise to release such inadmissible aliens into the United States.

---

[3] The legislative history leading up to the enactment of IIRIRA reflects Congress's disapproval of the Executive Branch's overuse of the parole authority. For instance, a House Judiciary Committee Report complained of "recent abuse of the parole authority" by the Clinton administration in "using the parole authority to admit up to 20,000 Cuban nationals annually." H.R. Rep. No. 104-469, part 1 at 140 (1996). The committee report concluded:

> Parole should only be given on a case-by-case basis for specified urgent humanitarian reasons, such as life-threatening humanitarian medical emergencies, or for specified public interest reasons, such as assisting the government in a law-enforcement-related activity. It should not be used to circumvent Congressionally-established immigration policy or to admit aliens who do not qualify for admission under established legal immigration categories.

*Id.* at 141. The Senate Judiciary Committee Report stated that its parole reform provision was intended to "reduce[] the abuse of parole" and "[t]ighten[] the Attorney General's parole authority," and that "[t]he committee bill is needed to address ... the abuse of humanitarian provisions such as asylum and parole." S. Rep. No. 104-249 at 2 (1996).

*Texas MPP*, 20 F.4th at 997; *see also id.* at 995-98 (noting that the bond-and-conditional-parole provision at 8 U.S.C. § 1226(a) does not apply to aliens detained under section 1225(b)). Indeed, the congressional scheme is designed to ensure that illegal aliens apprehended at the border are detained until they are either removed or have their asylum claims or removal proceedings fully adjudicated.

48.     Both the statute and regulations require Defendants to initiate removal proceedings against both B-1 and B-2 aliens. Although section 1225(b)(1) provides only for full consideration of an asylum claim after a B-1 alien establishes a credible fear of persecution, 8 U.S.C. § 1225(b)(1)(B)(ii) (requiring detention of a B-1 alien pending "further consideration of the application for asylum"), the Board of Immigration Appeals has held that DHS retains discretion to place B-1 aliens in regular removal proceedings. *See Matter of E-R-M- & L-R-M-*, 25 I&N Dec. 520, 523 (BIA 2011). In turn, the regulations governing the credible fear screening process direct immigration officers to initiate regular removal proceedings against any B-1 alien who establishes a credible fear of persecution. *See* 8 C.F.R. § 208.30(f) (2020) ("If an alien … is found to have a credible fear of persecution or torture, the asylum officer will so inform the alien and issue a Form I-862, Notice to Appear, for full consideration of the asylum and withholding of removal claim in proceedings under [8 U.S.C. § 1229a].").[4]

---

[4] A notice to appear is the charging document that initiates removal proceedings against an alien. *See* 8 U.S.C. § 1229(a). On December 23, 2020, DHS published a final rule amending 8 C.F.R. § 208.30(f) to require referral of such cases to an immigration judge for an "asylum-and-withholding-only proceeding" as opposed to a full removal proceeding. *See* Security Bars and Processing (Final Rule), 85 Fed. Reg. 84160, 84195

49. Section 1225(b)(2)(A) similarly requires initiation of removal proceedings against B-2 aliens. 8 U.S.C. § 1225(b)(2)(A) (providing that inadmissible B-2 aliens "shall be detained *for a proceeding under section 1229a* of this title"). The regulation governing inspections of such B-2 aliens simply restates this requirement. *See* 8 C.F.R. § 235.3(c) (stating that "any arriving alien who appears to the inspecting officer to be inadmissible, and who is placed in removal proceedings … shall be detained in accordance with [8 U.S.C. § 1225(b)]").

50. In addition to prescribing the detention and removal of arriving aliens, the INA also defines the classes of aliens who are removable from the United States. Congress has specified numerous classes of aliens who are removable from the United States, such as aliens who enter illegally, commit certain crimes, violate the terms of their status (visa overstays), obtain admission through fraud or misrepresentation, vote unlawfully, become a public charge, and whose work would undermine wages or working conditions of American workers. *See generally* 8 U.S.C. §§ 1182(a) (defining inadmissible aliens) and 1227(a) (defining deportable aliens).

51. Congress did not in any way authorize the Executive Branch to redefine the classes of removable aliens or to treat statutory definitions as insufficient to warrant removal. Instead, Congress provided for the consideration of mitigating circumstances

---

(Dec. 23, 2020). That amendment has been delayed until at least December 31, 2024. *See generally* Security Bars and Processing; Delay of Effective Date, 87 Fed. Reg. 79789 (Dec. 28, 2022).

through various statutory forms of relief from removal, such as asylum, cancellation of removal, adjustment of status, and various waivers of inadmissibility.

52.　　Congress has also directed the Secretary of Homeland Security to "take all actions the Secretary determines necessary and appropriate to achieve and maintain operational control[5] over the entire international land and maritime borders of the United States," including "physical infrastructure enhancements to prevent unlawful entry by aliens into the United States …." § 2(a), Secure Fence Act of 2006, Pub. L. 109-367, 120 Stat. 2638 (codified as note to 8 U.S.C. § 1701).

53.　　In addition, Congress directed the Secretary to "construct reinforced fencing along not less than 700 miles of the southwest border where fencing would be most practical and effective and provide for the installation of additional physical barriers, roads, lighting, cameras, and sensors to gain operational control of the southwest border." Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), § 102(b)(1)(A), Pub. L. 104-208, 110 Stat. 3009-546, -554 (as amended and codified as a note to 8 U.S.C. § 1103).

54.　　To facilitate construction of such physical infrastructure enhancements and reinforced fencing, Congress appropriated, in both FY 2020 and FY 2021, $1.375 billion for "construction of a barrier system along the southwest border," and provided that this

---

[5] "Operational control" is defined as "the prevention of all unlawful entries into the United States, including entries by terrorists, *other unlawful aliens*, instruments of terrorism, narcotics, and other contraband." § 2(b), Secure Fence Act of 2006, Pub. L. 109-367, 120 Stat. 2638 (codified as note to 8 U.S.C. § 1701) (emphasis added).

money "shall only be available for barrier systems." Consolidated Appropriations Act, 2020, Pub. L. 116-93, Div. D, § 209(a)(1), 133 Stat. 2317, 2511 (2019); Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, Div. F, § 210, 134 Stat. 1182, 1456–57 (2020) (appropriating an equal amount "for the same purposes").

55.    In addition to immigration and border security statutes, Congress has enacted the National Environmental Policy Act ("NEPA"),[6] which is "a procedural statute intended to ensure Federal agencies consider the environmental impacts of their actions in the decision-making process." 40 C.F.R. § 1500.1(a).

56.    NEPA expressly recognizes congressional concern for "the profound influences of population growth" on "the natural environment[.]" 42 U.S.C. § 4331(a). Through NEPA, Congress directs, in relevant part, that the federal government shall:

> use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may—
> …
> (5) *achieve a balance between population and resource use* which will permit high standards of living and a wide sharing of life's amenities . . . .

42 U.S.C. § 4331(b) (emphasis added).

57.    To accomplish its goals, NEPA requires each federal agency to identify and consider the environmental impacts of its proposed federal actions. *See generally*

---

[6] On June 3, 2023, Congress enacted the Fiscal Responsibility Act of 2023, in which it amended NEPA. *See* Pub. L. 188-5, Div. C, Title III, § 321, 137 Stat. 38-46. These amendments are generally consistent with pre-amendment regulations and judicial interpretations, including the Supreme Court's focus on NEPA's inherent "rule of reason." *See DOT v. Public Citizen*, 541 U.S. 741, 767 (2004).

42 U.S.C. § 4331. Under NEPA, before taking any "major Federal action[] significantly affecting the quality of the human environment," a federal agency must prepare a detailed statement discussing the likely environmental impacts of the action and potential alternatives. 42 U.S.C. § 4332(2)(C);[7] *see also* 40 C.F.R. § 1500.1(a) ("The purpose and function of NEPA is satisfied if Federal agencies have considered relevant environmental information, and the public has been informed regarding the decision-making process.").

58.    The Council on Environmental Quality ("CEQ") regulations provide guidance as to which "actions are subject to NEPA's procedural requirements and the level of NEPA review where applicable." 40 C.F.R. § 1500.1(b). The CEQ defines "major federal actions" as those tending to fall within one of the following categories:

> (i) Adoption of official policy, such as rules, regulations, and interpretations adopted under the Administrative Procedure Act, 5 U.S.C. 551 *et seq.* or other statutes; implementation of treaties and international conventions or agreements, including those implemented pursuant to statute or regulation; *formal documents establishing an agency's policies which will result in or substantially alter agency programs.*

> (ii) Adoption of formal plans, such as official documents prepared or approved by Federal agencies, which *prescribe alternative uses of Federal resources*, upon which future agency actions will be based.

> (iii) *Adoption of programs, such as a group of concerted actions to implement a specific policy or plan; systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive.*

---

[7]  Recent amendments to this statute require environmental impact statements to consider the "reasonably foreseeable environmental effects of the proposed agency action" and analysis of a "reasonable range" of alternatives that are "technically and economically feasible" and meet the purpose and need of the proposed action. *See* § 321(a), Pub. L. 188-5, Div. C, Tit. III, 137 Stat. 38-39 (June 3, 2023).

(iv) Approval of specific projects, such as construction or management activities located in a defined geographic area. Projects include actions approved by permit or other regulatory decision as well as Federal and federally assisted activities.

40 C.F.R. § 1508.1(q)(3) (emphasis added).

59.    If a proposed action "[n]ormally does not have a significant impact," such actions may be categorically excluded from NEPA procedures. 40 C.F.R. § 1501.3(a)(1); *see also* 40 C.F.R. § 1501.4 (permitting agencies to identify "categories of actions that normally do not have a significant effect on the human environment" that can be categorically excluded from NEPA procedures).

60.    If a proposed action "[i]s not likely to have significant effects or the significance of the effects is unknown," an agency may prepare an Environmental Assessment ("EA") to evaluate whether a detailed Environmental Impact Statement ("EIS") is required. 40 C.F.R. § 1501.3(a)(2); *see also* 40 C.F.R. § 1501.5(a) (requiring agencies to "prepare an environmental assessment for a proposed action that is not likely to have significant effects or when the significance of the effects is unknown unless the agency finds that a categorical exclusion (§ 1501.4) is applicable or has decided to prepare an environmental impact statement"). If a proposed action is determined—based upon an environmental assessment—to have no significant impact, the agency must issue a "finding of no significant impact" ("FONSI") and make it available to the public. 40 C.F.R. § 1501.6(a).

61.    If a proposed action "[i]s likely to have significant effects," an agency must prepare an EIS. 40 C.F.R. § 1501.3(a)(3); *see also* 40 C.F.R. § 1502.3 (requiring an EIS

"to be included in every Federal agency recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment"). "The primary purpose of an environmental impact statement prepared pursuant to section 102(2)(C) of NEPA is to ensure agencies consider the environmental impacts of their actions in decision making." 40 C.F.R. § 1502.1. Accordingly, an EIS must be prepared "early enough so that it can serve as an important practical contribution to the decision-making process and will not be used to rationalize or justify decisions already made." 40 C.F.R. § 1502.5; *see also id.* at (d) ("For informal rulemaking, the draft environmental impact statement shall normally accompany the proposed rule.").

62.    The CEQ regulations recognize that major federal actions may affect the human environment nationwide. *See* 40 C.F.R. § 1501.3(b)(1) ("In considering the potentially affected environment, agencies should consider, as appropriate to the specific action, the affected area (national, regional, or local) and its resources ….").

63.    In 2014, DHS adopted Instruction Manual 023-01-001-01, Revision 01, implementing the NEPA.[8] Nothing in the Manual suggests that immigration policy

---

[8]    Available at: https://www.dhs.gov/sites/default/files/publications/DHS_Instruction%20Manual%20023-01-001-01%20Rev%2001_508%20Admin%20Rev.pdf (last visited July 10, 2023); *see also* DHS Directive Number: 023-01, available at: https://www.dhs.gov/sites/default/files/publications/DHS_Directive%20023-01%20Rev%2001_508compliantversion.pdf (last visited July 10, 2023) (stating, "This Directive and the Instruction Manual adopt and supplement the CEQ regulations and are to be used in conjunction with those regulations.").

decisions fall outside the reach of NEPA. Instead, the Manual explicitly recognizes that "NEPA applies to the majority of DHS actions," and that "[e]xamples of situations in which NEPA is not triggered are very few and include cases of statutory exemption, executive branch waiver of compliance when such waiver authority has been granted by Congress and properly exercised, or when the action does not constitute a major Federal action …." Manual at V-1.

64.     Absent a statutory exemption or a properly invoked waiver authorized by Congress, NEPA requires federal agencies to prepare either an EA or EIS before taking any major federal action unless such action is properly determined to fall within a categorical exclusion to NEPA. Absent a statutory exclusion, the Manual similarly recognizes any NEPA analysis must result in one of these three potential outcomes. *See* Manual at V-3. The Manual further provides that categorical exclusions (or "CATEXs") "enable DHS to avoid unnecessary efforts, paperwork, and delays and concentrate on those proposed actions having real potential for environmental impact." *Id.* at V-4. The Manual does not, however, prescribe any particular outcome regarding NEPA review of proposed actions—including whether any CATEX applies to a specific action.

65.     The list of CATEXs in the Manual provides insight to the kinds of actions that could be excluded from NEPA analysis and, by contrary implication, those actions that would require further environmental analysis. Most pertinent with respect to this case is DHS's CATEX A3, which excludes from NEPA certain rules, policies, orders, directives, and other guidance documents. *See* Manual at A-1--A-2. Under CATEX A3(c), DHS categorically excludes only such actions that "implement, *without*

*substantive change*, procedures, manuals, and other guidance documents." (emphasis added).

**B.    Defendants' Unlawful Actions**

66.    Immediately upon being sworn into office, the current Administration has pursued immigration policies that are not only at odds with Congress's statutory scheme and directives but are objectively calculated to dismantle proven border security programs or craft novel administrative processing "pathways" to permit inadmissible aliens to enter and remain inside the country. Indeed, Defendants have gone so far as to suspend Congress's determination of which classes of aliens are removable and has assumed the power to impose additional non-statutory and vaguely defined mitigating or aggravating factors on top of Congress's removal classifications. Moreover, the Administration took each of these major federal actions without complying with the procedural requirements established by NEPA.

67.    As noted above, Congress has charged the Secretary of DHS with preventing all unlawful entries into the United States—that is, achieving operational control of the border by taking all actions necessary and appropriate, including the construction of border walls. Although DHS had determined that physical barriers on the southwest border as well as the Migrant Protection Protocols ("MPP") (colloquially, the "Remain in Mexico policy") were extremely effective at preventing or reducing illegal

immigration,[9] the Biden Administration, immediately upon taking office, paused all construction of the border wall and suspended the MPP. *See* Presidential Proclamation "Termination of Emergency with Respect to the Southern Border of the United States and Redirection of Funds Diverted to Border Wall Construction," 86 Fed. Reg. 7225, 7225 (Jan. 20, 2021); *see also* DHS press release, "DHS Statement on the Suspension of New Enrollments in the Migrant Protection Protocols Program," (Jan. 20, 2021), available at: https://www.dhs.gov/news/2021/01/20/dhs-statement-suspension-new-enrollments-migrant-protection-protocols-program.

68.    DHS also paused all removals for 100 days[10] and ultimately adopted an interior enforcement prioritization policy under the guise of prosecutorial discretion that directs immigration officers not to take enforcement actions against any alien deemed

---

[9] *See*, *e.g.*, DHS Press Release, "We Must Secure The Border And Build The Wall To Make America Safe Again," (Feb. 15, 2018), available at: https://www.dhs.gov/news/2018/02/15/we-must-secure-border-and-build-wall-make-america-safe-again (last visited July 10, 2023) (describing border walls as "extremely effective" and noting that areas with border walls "have seen 95 percent drops in attempted illegal border crossings"); DHS, Assessment of the Migrant Protection Protocols (MPP), at 2 (Oct. 28, 2019), available at: https://www.dhs.gov/sites/default/files/publications/assessment_of_the_migrant_protection_protocols_mpp.pdf (last visited July 10, 2023) ("DHS has observed a connection between MPP implementation and decreasing enforcement actions at the border—including a rapid and substantial decline in apprehensions in those areas where the most amenable aliens have been processed and returned to Mexico pursuant to MPP.").

[10] *See* DHS memorandum titled "Review of and Interim Revision to Civil Immigration Enforcement and Removal Policies and Priorities" (Jan. 20, 2021), https://www.dhs.gov/sites/default/files/publications/21_0120_enforcement-memo_signed.pdf; *id.* at 3-4 (directing an immediate pause on removals for any alien with a final order of removal).

removable by statute absent additional aggravating circumstances. DHS memorandum titled "Guidelines for the Enforcement of Civil Immigration Law" (Sept. 30, 2021), https://www.ice.gov/doclib/news/guidelines-civilimmigrationlaw.pdf; *see id.* at 2 ("The fact an individual is a removable noncitizen therefore should not alone be the basis of an enforcement action against them."); *id.* at 4 ("Our personnel should not rely on the fact of conviction or the result of a database search alone.").

69.    According to DHS's guidelines, "mitigating factors that militate in favor of declining enforcement action" must be considered before any enforcement action may be taken. The Memorandum listed the following examples of such factors:

> • advanced or tender age;
>
> • lengthy presence in the United States;
>
> • a mental condition that may have contributed to the criminal conduct …;
>
> • status as a victim of crime or victim, witness, or party in legal proceedings;
>
> • the impact of removal on family in the Unites states, such as loss of provider …:
>
> • whether the noncitizen may be eligible for humanitarian protection …;
>
> • military or other public service of the noncitizen or their immediate family;
>
> • time since an offense and evidence of rehabilitation;
>
> • conviction was vacated or expunged.

*Id.* at 3-4.

70.     Conversely, the guidelines memorandum states that conviction of a crime alone is not enough to warrant an enforcement action and that aggravating factors must be considered in such cases, such as:

> • the gravity of the offense of conviction and the sentence imposed;
>
> • the nature and degree of harm caused by the criminal offense;
>
> • the sophistication of the criminal offense;
>
> • use or threatened use of a firearm or dangerous weapon;
>
> • a serious prior criminal record.

*Id.* at 3.

71.     In contrast, Congress has deemed aliens convicted of certain crimes to be removable solely based upon the fact of conviction. *See generally* 8 U.S.C. § 1227(a)(2) (listing various offenses, a conviction of which alone renders an alien deportable).

72.     With respect to the mitigating circumstances identified in the guidelines memorandum, Congress has already defined certain mitigating circumstances that would render an alien eligible for relief from removal. For instance, certain aliens who have accrued a lengthy presence in the United States (ten years) and for whom their removal would cause hardship to a qualifying relative can qualify for cancellation of removal. *See* 8 U.S.C. § 1229b(b) (cancellation of removal for nonpermanent residents); *id.* at (a) (cancellation of removal for permanent residents with seven years presence, five of which in permanent resident status).

73.     By declaring that Congress's determination of which classes of aliens are removable *insufficient* to warrant enforcement action, DHS has in effect declared an

executive amnesty. It constitutes a total abdication of statutory responsibilities within an area of the law—that is, the law defining those classes of aliens who are removable.[11]

74.    Moreover, by creating its own non-statutory and vaguely-defined mitigating (or aggravating) circumstances that may, based solely on the Executive's whim, warrant removal action, DHS is violating the separation of powers. It is both legislating and legislating poorly. It crafts a new rule, but an ill-defined rule that depends on the subjective judgment of the Executive.

75.    More recently, the administration has adopted several unlawful parole policies that would allow vast numbers of aliens with no valid entry documents to enter

---

[11]    Alternatively, it constitutes a suspension of the law. Addressing the reviewability of agency rules, the Fifth Circuit recently recounted how the "take care" clause of the Constitution, Art. II, sec. 3, derived from the prohibition in the English Bill of Rights against the English kings' prerogatives to suspend or dispense with the laws. *Texas v. Biden ("Texas MPP")*, 20 F.4th 928, 978-82 (5th Cir. 2021), *rev'd on other grounds*, 142 S. Ct. 2528 (2022). The Fifth Circuit concluded that:

> Congress *can* rebut the common-law presumption that nonenforcement discretion is unreviewable. Specifically, "the presumption may be rebutted where the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers." [*Heckler*, 470 U.S.] at 832-33. In other words, the executive *cannot* look at a statute, recognize that the statute is telling it to enforce the law in a particular way or against a particular entity, and tell Congress to pound sand. So *Heckler* expressly embraces the common law's condemnation of the dispensing power. ... Moreover, the Court emphasized that nothing in the *Heckler* opinion should be construed to let an agency "consciously and expressly adopt[] a general policy that is so extreme as to amount to an abdication of its statutory responsibilities." *Heckler*, 470 U.S. at 833 n.4 (quotation omitted). This, of course, is a condemnation of the suspending power.

*Texas MPP*, 20 F.4th at 982 (emphases in original).

the country with lawful status, receive instant work authorization, and become eligible for public benefits. DHS disingenuously refers to these unlawful parole policies as "additional" "new" "safe, orderly, and lawful pathways to the United States." DHS Press Release, "DHS Continues to Prepare for End of Title 42; Announces New Border Enforcement Measures and Additional Safe and Orderly Processes," released January 5, 2023, available at: https://www.dhs.gov/news/2023/01/05/dhs-continues-prepare-end-title-42-announces-new-border-enforcement-measures-and (last visited March 7, 2024).

76.    After announcing the creation of a new parole program that will allow up to 30,000 aliens from Cuba, Haiti, Nicaragua, or Venezuela to enter the United States each month ("CHNV Parole Program"), DHS, on January 9, 2023, published four separate notices in the Federal Register describing the program. *See* Implementation of a Parole Process for Cubans, 88 Fed. Reg. 1266 (Jan. 9, 2023); Implementation of a Parole Process for Haitians, 88 Fed. Reg. 1243 (Jan. 9, 2023); Implementation of a Parole Process for Nicaraguans, 88 Fed. Reg. 1255 (Jan. 9, 2023); Implementation of Changes to the Parole Process for Venezuelans, 88 Fed. Reg. 1279 (Jan. 9, 2023).

77.    Absent any statutory authority, DHS announced that under the CHNV Parole Program:

> individuals can seek advance authorization to travel to the United States and be considered, on a case-by-case basis, for a temporary grant of parole for up to two years, including employment authorization, provided that they: pass rigorous biometric and biographic national security and public safety screening and vetting; have a supporter in the United States who commits to providing financial and other support; and complete vaccinations and other public health requirements.

January 5, 2023, Press Release. The new CHNV Parole Program "will allow up to 30,000 qualifying nationals per month from all four of these countries to reside legally in the United States for up to two years and to receive permission to work here, during that period." *Id.*

78.     In addition to the CHNV Parole Program, DHS has created yet another parole program for nationals of Columbia, Honduras, Guatemala, and El Salvador. *See* Implementation of a Family Reunification Parole Process for Colombians, 88 Fed. Reg. 43591 (July 10, 2023); Implementation of a Family Reunification Parole Process for Hondurans, 88 Fed. Reg. 43601 (July 10, 2023); Implementation of a Family Reunification Parole Process for Guatemalans, 88 Fed. Reg. 43581 (July 10, 2023); Implementation of a Family Reunification Parole Process for Salvadorans, 88 Fed. Reg. 43611 (July 10, 2023). Under this Family Reunification Parole Process ("FRP Process"), United States citizens and lawful permanent residents may "request for certain family members to receive advance authorization to travel to the United States to seek parole at an interior [port of entry]." *E.g.*, 88 Fed. Reg. at 43603. "Individuals who are eligible to be considered for parole under this process include nationals of [one of the four countries] who are beneficiaries of an approved Form I–130 family-based immigrant petition, as well as their immediate family members, who are outside the United States and who have not yet received an immigrant visa." *Id.*

79.     DHS describes this FRP process as a "new lawful and flexible pathway[] for tens of thousands of migrants and refugees as an alternative to irregular migration."

*Id.* at 43605.[12] According to DHS, "this FRP process could discourage beneficiaries whose immigrant visas are not expected to become available soon from engaging in irregular migration" and "is expected to reduce the number of irregular migrants encountered at the [southwest border], thereby providing a significant public benefit by reducing the strain on border reception and processing capacity, including by diverting the processing of individuals to interior [ports of entries]." *Id.*

80.    Aliens paroled into the United States under this FRP process "will generally be paroled for up to three years" and "will be able to request employment authorization while they wait for their immigrant visa to become available and to apply for adjustment of status to that of an LPR once an immigrant visa becomes available to them." *Id.* at 43603.

81.    In addition to the CHNV and FRP process, DHS also permits inadmissible aliens to use their CBP One mobile application to schedule an appointment at a port of entry where aliens without appropriate documents for admission may "present themselves for inspection and to initiate a protection claim …." *DHS Scheduling System for Safe, Orderly and Human Border Processing Goes Live on CBP One App*, available at: https://www.dhs.gov/news/2023/01/12/dhs-scheduling-system-safe-orderly-andhumane-border-processing-goes-live-cbp-onetm (last visited March 7, 2024).

---

[12]    In May, the Administration announced that "it will admit at least 100,000 Latin Americans seeking to reunite with family members in the United States" under the FRP process. US will let in at least 100,000 Latin Americans to reunite with families, https://apnews.com/article/us-immigration-family-reunification-d94cd500548ce5981601737976ab6df3 (last visited March 7, 2024).

82.     DHS describes the CBP One app as "a continuation of the Biden administration's expansion of lawful pathways and opportunities to access them." *U.S. plans to admit nearly 40,000 asylum-seekers per month through mobile app*, CBS News, https://www.cbsnews.com/news/asylum-seekers-cbp-one-mobile-app-u-s-plans-admit-nearly-40000-monthly/ (last visited March 7, 2024). Through the use of the CBP One app, the Biden administration seeks to "dramatically expand the processing of asylum-seekers along the U.S.-Mexico border by admitting nearly 40,000 migrants" each month (or 1,250 appointments each day). *Id.* DHS subsequently increased the number of appointments to 1,450 per day (or more than 43,000 per month). Press Release, June 30, 2023, CBP One Appointments Increased to 1,450 Per Day, https://www.cbp.gov/newsroom/national-media-release/cbp-one-appointments-increased-1450-day (last visited March 7, 2024).

83.     According to DHS data, from January 12, 2023 through September 2023, nearly 267,000 foreign nationals were issued an NTA "and released into the United States on parole" by using the CBP One app. https://homeland.house.gov/2023/10/23/new-documents-obtained-by-homeland-majority-detail-shocking-abuse-of-cbp-one-app/ (last visited March 7, 2024). This number includes more than 100,000 aliens in addition to 136,000 entries under the CHNV program. Todd Bensman, Center for Immigration Studies, *New Records Unveil Surprising Scope of Secretive 'CBP One' Entry Scheme*, available at: https://cis.org/Report/New-Records-Unveil-Surprising-Scope-Secretive-CBP-One-Entry-Scheme (last visited March 7, 2024).

84.    These parole programs and processes constitute an abuse and unlawful distortion of DHS's narrow parole authority. Instead of making an individualized determination that the parole of "any [individual] alien applying for admission to the United States" serves an "urgent humanitarian" purpose or that the presence of *that alien* would provide a "significant public benefit," 8 U.S.C. § 1182(d)(5)(A), DHS is creating new immigration "pathways" that permit parole on a programmatic basis unauthorized by Congress. Congress limited the Secretary's authority to "parole into the United States temporarily under such conditions as he may prescribe only *on a case-by-case basis* for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States." 8 U.S.C. § 1182(d)(5)(A) (emphasis added). This "case-by-case" requirement was added by Congress in 1996 to restrict the scope of the parole power and prevent the Secretary from paroling whole classes of aliens who do not otherwise qualify for admission under the INA.

85.    In addition to distorting its limited parole authority beyond recognition, DHS's parole programs work at cross-purposes to those set by Congress. Whereas Congress crafted a statutory scheme that is designed to prevent or severely limit the number of unlawful entries, DHS has crafted policies designed to *facilitate* and *increase* the number of unlawful entries (no matter that DHS, which like everyone is presumed to

33

know the law, insists on describing these new processing "pathways" as "lawful" or "legal").[13]

86.    In addition to being unlawful and contrary to 8 U.S.C. § 1182(d)(5)(A), Defendants' newly crafted parole programs violate their duty under the Take Care clause because the programs work at cross-purposes to those set by Congress.

87.    Collectively, Defendants' actions signaled to potential border crossers— and to the human-trafficking and drug cartels that coordinate illegal border crossing— that the Administration is unwilling to secure our border. These actions have resulted in the ongoing, record-setting surge of migrants at the southern border. Indeed, the actions by the Administration reflect a conscious decision to cease effective immigration enforcement policies and to pursue a general policy of non-enforcement.

88.    In short, Defendants have completely abdicated their statutory responsibilities, allowed or encouraged the southern border to be overrun, and are violating their duty to take care that the laws be faithfully executed.

89.    The number of aliens that will be paroled under Defendants' unlawful policies will likely outnumber the number of all lawful immigrant visas expected to be available this year. The total number of immigrant visas available for fiscal year 2023 is 478,000. *See* Annual Numerical Limits FY-2023 (estimated), available at:

---

[13]    In any event, there is no doubt that by paroling aliens into the country under 8 U.S.C. § 1182(d)(5), DHS *is* conferring a lawful status upon these aliens. *See*, *e.g.*, 8 U.S.C. § 1641(b)(4) (including parolees in the definition of "qualified alien" who is eligible for federal public benefits).

https://travel.state.gov/content/dam/visas/Statistics/Immigrant-

Statistics/Annual%20%20Numerical%20%20Limits%20-%20FY_2023.pdf (showing

226,000 family-based visas and 197,000 employment-based visas available for fiscal year

2023); *see also* 8 U.S.C. § 1151(e) (making 55,000 diversity immigrant visas available

annually).[14] In contrast, DHS has authorized parole of at least 460,000 under the CHNV

Parole Program and FRP process (360,000 CHNV parolees + 100,000 FRP parolees). In

other words, Defendants have created an immigration "pathway" likely to surpass the

number of immigrant visas Congress has made available for the entire fiscal year.

Defendants' non-enforcement immigration policies are contrary and inimical to

Congress's statutory scheme, and should be enjoined.

90.    These policies are not only a wholesale abdication of Defendants' duty to

enforce the law, but reflect policy goals that run counter to the statutory scheme in the

teeth of clear statutory commands to the contrary. Indeed, Defendants adopted these

unlawful policies with the knowledge that these policies, working in concert, would

encourage and facilitate the release of hundreds of thousands of unlawful immigrants into

the United States per month while simultaneously preventing the removal of the vast

majority of aliens who are unlawfully present in the United States. Whatever it may mean

to take care that the laws be faithfully executed, it simply cannot mean that the Executive

---

[14]  The number of family and employment-based immigrant visas available each
fiscal year varies depending on the number of visas issued in preceding years and are also
subject to a nationality cap. *See generally* 8 U.S.C. § 1151(c)-(d).

branch may enact policies that create or promote the very conditions that Congress sought to combat through legislation.

91.    Unconstitutional agency action or inaction violates the Administrative Procedure Act ("APA"), *see* 5 U.S.C. § 706, and can be set aside or enjoined on that basis. Violations of the Take Care Clause, however, are also actionable independently of the APA, and this Court can enjoin the Defendants' violations of their Take Care obligations under its inherent equitable powers. *See Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 327-28 (2015) (discussing "a long history of judicial review of illegal executive action, tracing back to England"); *Davis v. Passman*, 442 U.S. 228, 241-44 (1979) (holding that the Constitution itself, coupled with 28 U.S.C. § 1331, provides a cause of action to challenge federal officials who violate the Constitution). The Constitution, moreover, permits anyone with standing to raise equitable claims (and seek injunctive relief) against federal officers who act unconstitutionally. *Larson v. Domestic & Foreign Comm. Corp.*, 337 U.S. 682, 698-99 (1949); *cf. Ex parte Young*, 209 U.S. 123 (1908). Thus, even if Plaintiffs' claims fail under the APA, the Take Care Clause provides an independent cause of action to challenge Defendants' nonenforcement policies.

92.    In addition, Defendants actions should be vacated and enjoined for failing to comply with NEPA's procedural requirements. In taking each of the discrete actions challenged here, Defendants failed to properly invoke a categorical exclusion, prepare an EA resulting in a finding of no significant impact, or prepare a detailed EIS. Accordingly,

Defendants failed to comply with their own Instruction Manual and NEPA's requirement to consider potential environmental impacts before taking action.

## V.    IRREPARABLE HARM

93.    Defendants' abdication of their duty to faithfully enforce the INA, their cessation of effective border policies, and their adoption of unlawful enforcement and parole policies significantly injures Plaintiffs.

94.    Defendants' failure to comply with the procedural requirements of NEPA also significantly injures Plaintiffs.

95.    As a result of Defendants' policies, since early 2021, millions of inadmissible aliens have been induced into traveling to the United States border and have been released into the interior of the United States, rather than being detained or required to remain in Mexico.

96.    Defendants' non-enforcement and parole policies have caused great harm to Plaintiff Vickers' ranch. Because of Defendants' policies, tens of thousands of illegal aliens have been released into the interior who thereafter travel cross country across the grasslands of Plaintiff's ranch. In so doing, aliens routinely cause thousands of dollars in damage to fences or gates as they pass through the ranch. Since early 2021, Plaintiff Vickers has incurred more than $50,000 in fence and gate damages alone. Plaintiff Vickers has also spent thousands of dollars to mitigate environmental damage.

97.    Aliens also deposit tons of trash and litter as they traverse Plaintiffs' ranch, which compromises food and water sources for livestock. For instance, Plaintiff Vickers

has autopsied cows with their rumen (large stomach) impacted with plastic bags and trash. Cattle also escape through cut fences and gates torn down by illegal aliens.

98.     Plaintiff Vickers and his wife live on his ranch and their closest neighbor lives seven miles away. Plaintiff Vickers and his wife keep dogs for security, and their dogs have caught hundreds of criminal trespasses (many gang members), MS13, Tangoblast, Pistoleros, Mexican Mafia, etc.

99.     Plaintiff Vickers must always be armed with a pistol and rifle in order to feel safe due to the presence of criminal groups facilitating illegal migration. Over 270 dead bodies have been discovered in Brooks County alone since early 2021, most within 15 minutes in any direction of Plaintiff Vickers' home.

100.    Due to the Defendants' border policies and the resulting criminal trespasses and environmental damage, the value of Plaintiff Vickers' property has decreased by at least 33% to 45%.

101.     As a result of Defendants' unlawful policies, Plaintiffs Sheriff Coe and Kinney County have had to detain more aliens who commit crimes in the county. Detaining illegal alien criminals imposes significant costs upon the Plaintiffs.  These costs include the financial cost of detention and the consumption of scarce county law enforcement resources.

102.    Those detention costs have increased substantially as a result of Defendants' failure to enforce the INA, particularly those involved in criminal activity, because it increases the number of criminal illegal aliens that Plaintiff sheriffs and counties must detain.

103.    The cost of detaining additional individuals is significant, ranging from $48.00 to $80.00 per inmate, per day.

104.    In Kinney County, there has been a significant increase in the number of crimes committed by illegal aliens following the implementation Defendant's unlawful policies.

105.    Defendants' non-enforcement and parole policies have caused a surge in illegal immigration and corresponding increase in crime in Plaintiff Kinney County. This surge includes thousands of additional illegal aliens beyond the specific aliens that Defendants arrested but failed to remove or detain. Plaintiffs Sheriff Coe and Kinney County bear the financial costs of investigation, arrest, and detention caused by this increase in crime.

106.    For instance, in 2020, Kinney County reported 134 criminal charges for prosecution. The number of criminal charges reported for prosecution drastically increased shortly after Defendants implemented their non-enforcement policies in January 2021.

107.    In 2021, the number of criminal charges increased from 134 in 2020 to 2,708.

108.    In 2022, this number exploded to 6,800 criminal charges.

109.    In 2023, there were 5,826 criminal charges.

110.    The increase in illegal immigrant crime has caused Sheriff Coe, in fiscal year 2022 alone, to expend more than more than $50,000 of County funds than his office

was or will be reimbursed for by the State of Texas in Operation Lonestar and other programs designed to offset such expenses.

111.    Between June 2021 and March 2024, Kinney County incurred net expenditures in excess of $139,000 in responding to more than 120 immigration-related calls for emergency medical services.

112.    In fiscal year 2022 alone, Kinney County incurred the following net expenditures to deal with the increases in crimes committed by illegal aliens and smugglers:

- EMS immigration non-transport: over $65,000

- Autopsies and EMS transport: over $8,000

- Fuel expense: over $17,000

- Total: over $90,000

These expenses are above and beyond what Texas has reimbursed or will reimburse the County for in Operation Lonestar and other programs.

113.    Plaintiff Atascosa County has incurred a similar increase in immigration related net expenditures.

114.    In addition, Sheriff's deputies are not able to attend to their normal patrol and other public safety duties because the crime associated with the surge in illegal immigration has consumed their attention and time.

115.    Defendants' failure to enforce federal immigration law leave Plaintiff sheriff with no alternative but to release criminal aliens into the public when, prior to the

non-enforcement and parole policies of Defendants, ICE would have removed or detained such aliens as required by federal law.

116.    The release of illegal aliens and consequent endangering of the public effectively forces Plaintiff Sheriff Coe to violate his oath of office to preserve, protect, and defend the Constitution and laws of the United States and of Texas. In particular, Plaintiff Sheriff Coe is concerned that he is compelled to release illegal aliens who should be removed or detained under federal law.

## VI.    CLAIMS FOR RELIEF

### COUNT I

### Take Care Clause

117.    Plaintiffs incorporate by reference all preceding paragraphs.

118.    Under the APA, a court must "hold unlawful and set aside agency action" that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B). Even absent APA review, violations of the Take Care Clause are actionable under the Constitution itself or through this Court's inherent equitable powers.

119.    The Executive Branch has a duty to "take Care that the Laws be faithfully executed." U.S. CONST. art. II § 3. This constitutional limitation is binding on agencies and officers exercising executive power. *See* U.S. CONST. art. II, § 1, cl. 1 (vesting "[t]he executive Power" in the President.).

120.    Defendants' memorandum titled "Guidelines for the Enforcement of Civil Immigration Law" constitutes a total abdication of statutory responsibilities within an area of the law—that is, the law defining those classes of aliens who are removable.

121.    Alternatively, Defendants' guidelines constitute an unconstitutional suspension of the laws passed by Congress.

122.    Further, Defendants' termination of the MPP and border wall construction projects and the institution of the various parole programs are contrary to the statutory provisions enacted by Congress and work at cross-purposes to those set by Congress. Instead of preventing unlawful entries, Defendants' policies aim to facilitate and increase the number of unlawful entries. The fact that Defendants' refer to some such entries as "lawful" does not make them so. Defendants' actions constitute "an abdication of [their] statutory responsibilities," *Heckler v. Chaney*, 470 U.S. 821, 833 n.4 (1985), and thus a failure to take care that the laws by faithfully executed.

123.    Defendants' actions are unconstitutional and should be enjoined under the APA, 5 U.S.C. §706, or independently of the APA under the Take Care Clause itself.

## COUNT II

### APA – Agency action not in accordance with the law or in excess of authority (Violation of § 1182(d)(5) Parole Limitations)

124.    Plaintiff incorporates by reference all preceding paragraphs.

125.    Under the APA, a court must "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory … authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). Even absent APA review, violations of the INA are actionable through this Court's inherent equitable powers.

126.    Each of Defendants' parole programs—CHNV, FRP process, and the CBP One Parole Program—were adopted in excess of Defendants' statutory authority under 8

U.S.C. § 1182(d)(5). Defendants have adopted a conscious and express policy of not making such parole determinations "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit," as 1182(d)(5)(A) requires, but instead making such parole determinations *en masse* or on a class-wide basis.

127.    By failing to establish that these aliens are qualified for parole under the express terms of § 1182(d)(5)(A), Defendants render the release of these aliens unlawful under the INA. *See Texas MPP*, 20 F.4th at 997 ("DHS cannot use that power to parole aliens *en masse*; that was the whole point of the 'case-by-case' requirement that Congress added in IIRIRA.").

128.    Defendants' parole of aliens into the United States without satisfying § 1182(d)(5)'s express limitation of parole "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit" is "not in accordance with law" and "in excess of statutory … authority." 5 U.S.C. § 706(2)(A), (C), and should be set aside or enjoined under the APA, 5 U.S.C. §706.

## COUNT III

### APA – Agency action not in accordance with the law
### (NEPA violation)

129.    Plaintiff incorporates by reference all preceding paragraphs.

130.    Under the APA, a court must "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory … authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). Even absent APA review, violations of the INA are actionable through this Court's inherent equitable powers.

131.    Each of Defendants discrete actions failed to comply with the procedural requirements of NEPA.

132.    In taking each of the discrete actions challenged here, Defendants did not invoke a categorical exclusion, prepare an EA resulting in a finding of no significant impact, or a detailed EIS. For instance, Defendants ceased all border wall construction, terminated MPP, substantively changed their enforcement guidelines, and adopted the CHNV Parole Program, the FRP process, and the CBP One scheduling program without complying with NEPA. Therefore, these actions are "not in accordance with law" and should be vacated and enjoined under the APA, 5 U.S.C. §706.

## VII.   PRAYER FOR RELIEF

For the foregoing reasons, Plaintiffs ask this Court to:

a.    Declare that Defendants' enforcement guidelines are unconstitutional;

b.    Hold unlawful and set aside or enjoin Defendants' enforcement guidelines;

c.    Declare and hold unlawful and enjoin Defendants' CHNV Parole Program;

d.    Declare and hold unlawful and enjoin Defendants' FRP process;

e.    Declare and hold unlawful and set aside or enjoin Defendants' memorandum terminating MPP;

f.    Declare and hold unlawful and set aside or enjoin Defendants' Border Wall Plan Pursuant to Presidential Proclamation 10142;

g.    During the pendency of this action, preliminarily enjoin the forgoing actions;

h.    Award Plaintiff its costs and reasonable attorney's fees;

i.      Award such other and further relief as this Court deems equitable and just.

Respectfully submitted,

/s/ Christopher Hajec
CHRISTOPHER J. HAJEC*
D.C. Bar No. 492551
*Lead Counsel*

MATT A. CRAPO*
D.C. Bar No. 473355
Immigration Reform Law Institute
25 Massachusetts Ave., NW, Suite 335
Washington, D.C. 20001
(202) 232-5590
chajec@irli.org
mcrapo@irli.org

*Attorneys for Plaintiffs*
* pro hac vice admission pending