**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

| | |
|---|---|
| MICHAEL L. VICKERS, *et al.*,<br><br>                    Plaintiffs,<br><br>          v.<br><br>JOSEPH R. BIDEN, JR., President, in his official capacity, *et al.*,<br><br>                    Defendants. | Civil Action No. 2:24-cv-00169 |

**<u>Plaintiffs' Motion for Preliminary Injunction</u>**

CHRISTOPHER J. HAJEC
*Lead Counsel*

MATT A. CRAPO
Immigration Reform Law Institute
25 Massachusetts Ave., NW, Suite 335
Washington, D.C. 20001
(202) 232-5590
chajec@irli.org
mcrapo@irli.org

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

Table of Authorities ........................................................................................................... ii

Introduction ....................................................................................................................... 1

Argument ........................................................................................................................... 2

I.      Plaintiffs' are likely to succeed on the merits ......................................................... 3

     a.  The challenged policies are unlawful .................................................................. 3

          1.  Border Wall .................................................................................................. 3

          2.  Enforcement Priorities ................................................................................. 6

          3.  Termination of MPP ................................................................................... 12

          4.  Parole Programs .......................................................................................... 13

     b.  The challenged policies have caused the opposite of the effect Congress intended
          in the immigration laws ....................................................................................... 20

     c.  Defendants adopted the challenged policies in the full knowledge of their likely
          effects ................................................................................................................... 24

     d.  The challenged policies are instances of Defendants' failure to take care ............... 25

II.     The challenged policies are causing Plaintiffs irreparable harm ............................ 28

III.    The balance of equities and the public interest favor an injunction ....................... 31

Conclusion ...................................................................................................................... 33

Certificate of Conference

Certificate of Service

i

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Adams v. Richardson,*
480 F.2d 1159 (D.C. Cir. 1973) ...................................................................... 26

*Armstrong v. Exceptional Child Center, Inc.,*
575 U.S. 320 (2015) ....................................................................................... 25

*Biden v. Texas (Texas MPP II),*
597 U.S. 785 (2022) ................................................................................... 8, 13

*Bowsher v. Synar,*
478 U.S. 714 (1986) ......................................................................................... 1

*Consumers' Rsch. v. FCC,*
109 F.4th 743 (5th Cir. 2024) .......................................................................... 1

*Davis v. Passman,*
442 U.S. 228 (1979) ....................................................................................... 25

*Dep't of Homeland Sec. v. Thuraissigiam,*
591 U.S. 103 (2020) ....................................................................................... 10

*Florida v. United States,*
660 F. Supp. 3d 1239 (N.D. Fla. 2023) ..................................................... 23, 24

*Garland v. Aleman Gonzalez,*
596 U.S. 543 (2022) ....................................................................................... 26

*Gen. Land Off. of Tex. v. Biden,*
Nos. 7:21-cv-272, -420, 2024 U.S. Dist. LEXIS 40880 (S.D. Tex. Mar. 8, 2024) ... 5, 6

*Heckler v. Chaney,*
470 U.S. 821 (1985) ....................................................................................... 26

*Jennings v. Rodriguez,*
583 U.S. 281 (2018) ......................................................................................... 8

*Kendall v. United States ex rel. Stokes,*
37 U.S. 524 (1838) ..................................................................................... 2, 27

*Larson v. Domestic & Foreign Comm. Corp.*,
    337 U.S. 682 (1949) ................................................................ 26

*League of Women Voters v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) .................................................... 32

*Nken v. Holder*,
    556 U.S. 418 (2009) ................................................................ 31

*Office of Pers. Management v. Richmond*,
    496 U.S. 414 (1990) ................................................................ 27

*Texas v. Biden (Texas MPP)*,
    20 F.4th 928 (5th Cir. 2021) ................................. 12, 18, 19, 27

*Texas v. Biden (Texas MPP Remand)*,
    646 F. Supp. 3d 753 (N.D. Tex. 2022) .................................. 13

*Texas v. United States*,
    40 F.4th 205 (5th Cir. 2022) .................................................. 32

*Texas v. United States (Texas DAPA)*,
    809 F.3d 134 (5th Cir. 2015) ........................................... 31, 32

*Valley v. Rapides Parish Sch. Bd.*,
    118 F.3d 1047 (5th Cir. 1997) ............................................... 31

*Voting for Am., Inc. v. Steen*,
    732 F.3d 382 (5th Cir. 2013) ................................................... 2

*Wages & White Lion Invs., LLC, v. U.S. Food & Drug Admin.*,
    16 F.4th 528 (5th Cir. 2021) .................................................. 32

*Ex parte Young*,
    209 U.S. 123 (1908) ................................................................ 26

## STATUTES AND CONSTITUTION

5 U.S.C. § 706 ................................................................................. 25

5 U.S.C. § 706(2)(A) ................................................................. 12, 13

5 U.S.C. § 706(2)(C) ....................................................................... 12

iii

8 U.S.C. § 1101 ................................................................................................ 1

8 U.S.C. § 1103, note ....................................................................................... 4

8 U.S.C. § 1151(c) .......................................................................................... 22

8 U.S.C. § 1151(d) .......................................................................................... 22

8 U.S.C. § 1151(e) .......................................................................................... 22

8 U.S.C. § 1182(a) ............................................................................................ 8

8 U.S.C. § 1182(a)(6)(C) ................................................................................. 6

8 U.S.C. § 1182(a)(7) ....................................................................................... 6

8 U.S.C. § 1182(d)(5)(A) ................................................................... 13, 14, 18

8 U.S.C. § 1225(b) ............................................................................... 6, 12, 14

8 U.S.C. § 1225(b)(1) .......................................................................... 3, 10, 14

8 U.S.C. § 1225(b)(1)(A)(i) ........................................................................ 6, 7

8 U.S.C. § 1225(b)(1)(B)(ii) ....................................................................... 7, 10

8 U.S.C. § 1225(b)(1)(B)(iii)(IV) ............................................................... 7, 10

8 U.S.C. § 1225(b)(2) ............................................................................... 3, 14

8 U.S.C. § 1225(b)(2)(A) ...................................................................... 6, 7, 10

8 U.S.C. § 1225(b)(2)(B) .................................................................................. 6

8 U.S.C. § 1225(b)(2)(C) ...................................................................... 10, 12, 13

8 U.S.C. § 1227(a) ............................................................................................ 8

8 U.S.C. § 1229a ............................................................................................... 7

8 U.S.C. § 1252(f)(1) ...................................................................................... 26

8 U.S.C. § 1701, note.................................................................................... 1, 3

Consolidated Appropriations Act, 2020, Pub. L. 116-93, Div. D, § 209(a)(1),
133 Stat. 2317, 2511 (2019) ........................................................................... 4

Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, Div. F, § 210,
134 Stat. 1182, 1456–57 (2020) .................................................................... 4

Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"),
Pub. L. 104-208, 110 Stat. 3009-546, -554 ............................................. 4, 18

Immigration and Nationality Act, Pub. L. No. 414, 66 Stat. 163 (1952),
codified as amended at 8 U.S.C. § 1101 et seq. ........................................... 1

Secure Fence Act of 2006, Pub. L. 109-367, § 2, 120 Stat. 2638 ........................ 1, 3, 4

U.S. CONST. art. I, § 1 .................................................................................. 1

U.S. CONST. art. II, § 3 ............................................................................ 1, 25

## REGULATIONS

8 C.F.R. § 212.5(b) .................................................................................... 14

8 C.F.R. § 235.3(b)(4)(ii) ............................................................................ 14

8 C.F.R. § 235.3(c) .................................................................................... 14

## MISCELLANEOUS

H.R. Rep. No. 104-469, part 1 (1996) ........................................................... 18

Implementation of a Family Reunification Parole Process for Colombians,
88 Fed. Reg. 43591 (July 10, 2023) ............................................................ 16

Implementation of a Family Reunification Parole Process for Hondurans,
88 Fed. Reg. 43601 (July 10, 2023) ....................................................... 16, 17

Implementation of a Family Reunification Parole Process for Guatemalans,
88 Fed. Reg. 43581 (July 10, 2023) ............................................................ 16

Implementation of a Family Reunification Parole Process for Salvadorans,
88 Fed. Reg. 43611 (July 10, 2023) ............................................................ 16

Implementation of a Parole Process for Cubans,
88 Fed. Reg. 1266 (Jan. 9, 2023) ............................................................................ 14, 20

Implementation of a Parole Process for Haitians,
88 Fed. Reg. 1243 (Jan. 9, 2023) .................................................................................. 15

Implementation of a Parole Process for Nicaraguans,
88 Fed. Reg. 1255 (Jan. 9, 2023) .................................................................................. 15

Implementation of Changes to the Parole Process for Venezuelans,
88 Fed. Reg. 1279 (Jan. 9, 2023) ................................................................... 15, 19, 20

Presidential Proclamation "Termination of Emergency with Respect to the Southern
Border of the United States and Redirection of Funds Diverted to Border Wall
Construction," 86 Fed. Reg. 7225 (Jan. 20, 2021)......................................................... 5

Proclamation No. 10142, 86 Fed. Reg. 7225 (Jan. 27, 2021) ............................................. 5

## INTRODUCTION

Under our Constitution, only Congress has the power to legislate. U.S. CONST. art. I, § 1 ("All legislative Powers herein granted shall be vested in a Congress of the United States"). In the Immigration and Nationality Act, Pub. L. No. 414, 66 Stat. 163 (1952), codified as amended at 8 U.S.C. § 1101 et seq. ("INA"), Congress has done so in the form of a comprehensive statutory scheme, one of the chief purposes of which is "operational control of the border," defined as zero unlawful entries. Secure Fence Act of 2006, Pub. L. 109-367, § 2, 120 Stat. 2638 (codified as note to 8 U.S.C. § 1701). The policies challenged in this case, which in themselves are unlawful, have created the exact opposite of this purpose: a sudden, massive, and continuing surge in unlawful entries constituting what all now routinely acknowledge as a "border crisis." Because these policies were calculated to have just that result, and thus to deprive the laws they were issued under of their intended effect, they have robbed Congress of its legislative power. In this way, they constitute a failure to "take Care that the Laws be faithfully executed." U.S. CONST. art. II, § 3.

Legislation is intended to have real-world effects, and Congress wholly relies on the executive to achieve them by carrying out the laws. *See*, *e.g.*, *Bowsher v. Synar*, 478 U.S. 714, 726 (1986) ("The structure of the Constitution does not permit Congress to execute the laws"); *Consumers' Rsch. v. FCC*, 109 F.4th 743, 780 (5th Cir. 2024) ("Congress has always relied on the executive to execute tax laws."). Because of this, the Take Care Clause is necessary to preserve Congress's power. As further explained below, an executive that failed to execute some laws at all, or suspended or dispensed with their

1

application systematically, or knowingly subverted the laws' purposes using unlawful policies, would sever this constitutionally-vital connection between Congress's enactments and their intended effects. *See, e.g., Kendall v. United States ex rel. Stokes*, 37 U.S. 524, 613 (1838) ("[V]esting in the President a dispensing power . . . would be clothing the President with a power entirely to control the legislation of congress"). For this reason—to preserve Congress's legislative power—the Take Care Clause exists, and each of the above kinds of actions is equally a violation of it.

## ARGUMENT

In order to meet the standard for a preliminary injunction, Plaintiffs must demonstrate: "(1) a substantial likelihood that they will prevail on the merits; (2) a substantial threat that they will suffer irreparable injury if the injunction is not granted; (3) their substantial injury outweighs the threatened harm to the party to be enjoined; and (4) granting the preliminary injunction will not disserve the public interest." *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 386 (5th Cir. 2013).

Plaintiffs are able to show all of these factors, including a substantial likelihood of success on the merits. Each of the unlawful policies challenged here is an instance of Defendants' failure to take care that the laws be faithfully executed. That failure, operating through each policy, both alone and in conjunction with the others, has incentivized an influx of illegal aliens that is causing Plaintiffs irreparable harm. The Court should therefore enter a preliminary injunction against Defendants' failure to take care by enjoining these policies.

I.       **Plaintiffs are likely to succeed on the merits.**

Plaintiffs are likely to succeed on the merits of their take care claim. The policies challenged here, in themselves, are unlawful, and, both individually and collectively, they have caused the opposite of the effect Congress intended. Defendants, moreover, adopted these policies in the full knowledge that they would have this result. These policies, therefore, being calculated to have the opposite of the effect Congress intended in the laws these policies purportedly implement, deprive Congress of its legislative power, and therefore are instances of Defendants' failure to take care.

a.  **The challenged policies are unlawful.**

Since the day it began, the current Administration has pursued immigration policies that are not only at odds with Congress's statutory scheme and directives but are objectively calculated to dismantle proven border security programs or craft novel administrative processing "pathways" to permit inadmissible aliens to enter and remain inside the country. These policies not only subvert Congress's purposes in the immigration laws, but are in themselves unlawful.

*1. Border Wall.* Congress has established a comprehensive scheme governing the inspection, admission, and removal of aliens. Central to this scheme is the prevention of illegal entries and mandatory detention for aliens who attempt to enter the United States without proper documentation. *See* 8 U.S.C. § 1225(b)(1)-(2); § 2(a), Secure Fence Act of 2006, Pub. L. 109-367, 120 Stat. 2638 (codified as note to 8 U.S.C. § 1701) (directing the Secretary of Homeland Security to "take all actions the Secretary determines necessary and appropriate to achieve and maintain operational control"— defined as 'the

prevention of all unlawful entries into the United States'[1]—"over the entire international land and maritime borders of the United States," including constructing "physical infrastructure enhancements to prevent unlawful entry by aliens into the United States").

To prevent unlawful entries, Congress directed the Secretary to "construct reinforced fencing along not less than 700 miles of the southwest border where fencing would be most practical and effective and provide for the installation of additional physical barriers, roads, lighting, cameras, and sensors to gain operational control of the southwest border." Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), § 102(b)(1)(A), Pub. L. 104-208, 110 Stat. 3009-546, -554 (as amended and codified as a note to 8 U.S.C. § 1103). To facilitate construction of such physical infrastructure enhancements and reinforced fencing, Congress appropriated, in both FY 2020 and FY 2021, $1.375 billion for "construction of a barrier system along the southwest border," and provided that this money "shall only be available for barrier systems." Consolidated Appropriations Act, 2020, Pub. L. 116-93, Div. D, § 209(a)(1), 133 Stat. 2317, 2511 (2019); Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, Div. F, § 210, 134 Stat. 1182, 1456–57 (2020) (appropriating an equal amount "for the same purposes").

Although the Department of Homeland Security ("DHS") had determined that physical barriers on the southwest border, as well as the Migrant Protection Protocols

---

[1]  § 2(b), Secure Fence Act of 2006.

("MPP") (colloquially, the "Remain in Mexico policy"), were extremely effective at preventing or reducing illegal immigration,[2] the Biden Administration, immediately upon taking office, paused all construction of the border wall and suspended the MPP.[3] In pausing the construction of the border wall, Defendants held back the appropriated funds while reviewing their approach to the Southern border. *See* Proclamation No. 10142, 86 Fed. Reg. 7225-26 (Jan. 27, 2021). DHS ultimately adopted a "Plan" to expend these border wall funds on remediation projects or "barrier system attributes" such as lighting, cameras, and detection technology where a physical barrier had already been constructed. *See Gen. Land Off. of Tex. v. Biden*, Nos. 7:21-cv-272, -420, 2024 U.S. Dist. LEXIS

---

[2]  *See*, *e.g.*, DHS Press Release, "We Must Secure The Border And Build The Wall To Make America Safe Again," (Feb. 15, 2018), available at: https://www.dhs.gov/news/2018/02/15/we-must-secure-border-and-build-wall-make-america-safe-again (last visited Nov. 4, 2024) (describing border walls as "extremely effective" and noting that areas with border walls "have seen 95 percent drops in attempted illegal border crossings"); DHS, Assessment of the Migrant Protection Protocols (MPP), at 2 (Oct. 28, 2019), available at: https://www.dhs.gov/sites/default/files/publications/assessment_of_the_migrant_protection_protocols_mpp.pdf (last visited Nov. 4, 2024) ("DHS has observed a connection between MPP implementation and decreasing enforcement actions at the border—including a rapid and substantial decline in apprehensions in those areas where the most amenable aliens have been processed and returned to Mexico pursuant to MPP.").

[3] *See* Presidential Proclamation "Termination of Emergency with Respect to the Southern Border of the United States and Redirection of Funds Diverted to Border Wall Construction," 86 Fed. Reg. 7225, 7225 (Jan. 20, 2021); *see also* DHS press release, "DHS Statement on the Suspension of New Enrollments in the Migrant Protection Protocols Program," (Jan. 20, 2021), available at: https://www.dhs.gov/news/2021/01/20/dhs-statement-suspension-new-enrollments-migrant-protection-protocols-program.

40880, *7 (S.D. Tex. Mar. 8, 2024). The unlawfulness of Defendants' refusal to use the appropriated funds for "construction of a barrier system" has already been adjudicated in *General Land Office*, and for the reasons given by the district court in that case, "the bulk of the Government's obligations in the Plan do not comply" with Congress's direction that its appropriated money "be obligated for the construction of barriers at the Southwest border." *Id.* at *62.[4]

*2. Enforcement Priorities.* To deter unlawful entries, Congress has directed the Executive to detain all inadmissible aliens apprehended at the border. Section 1225(b), which governs inspection of applicants for admissions, distinguishes between two classes of arriving aliens. The first class consists of aliens who either have no entry documents or who attempt to gain admission through misrepresentation or fraud ("B-1 aliens"). 8 U.S.C. § 1225(b)(1)(A)(i).[5] The other class consists of all other arriving aliens ("B-2 aliens"). 8 U.S.C. § 1225(b)(2)(A), (B) (excluding B-1 aliens from definition of B-2 aliens).

---

[4] Plaintiffs in that case raised a Take Care claim, but the district court declined to reach the question because the Plaintiffs succeeded on their APA contrary-to-law claim. *Id.* at *47 ("Because the Court finds that the challenged agency action violates the APA, … the Court declines to reach Plaintiffs' separation-of-powers and Take Care Clause claims.").

[5] Section 1225(b)(1)(A)(i) refers to aliens who are "inadmissible under section 1182(a)(6)(C) or 1182(a)(7) of this title." Section 1182(a)(6)(C) describes aliens who seek a visa or admission through misrepresentation as inadmissible. Section 1182(a)(7), in turn, deems aliens with no valid entry document as inadmissible.

B-1 aliens are subject to mandatory detention and expedited removal. Such aliens "shall be" ordered removed from the United States "without further hearing or review unless the alien indicates either an intention to apply for asylum under section 1158 of this title or a fear of persecution." *See* 8 U.S.C. § 1225(b)(1)(A)(i). If an alien claims a fear of persecution, the alien "shall be detained pending a final determination of credible fear of persecution." *Id.* at § 1225(b)(1)(B)(iii)(IV). If the alien fails to establish a credible fear of persecution, the alien "shall be detained … until removed." *Id.* Even if the alien successfully establishes a credible fear of persecution, the alien remains subject to mandatory detention until the asylum claim is finally adjudicated. *See id.* at § 1225(b)(1)(B)(ii) ("the alien shall be detained *for further consideration of the application for asylum*") (emphasis added).

Inadmissible B-2 aliens are similarly subject to mandatory detention pending final adjudication of their admissibility. If an immigration officer determines that a B-2 alien, upon inspection, "is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained *for a proceeding* under section 1229a of this title." 8 U.S.C. § 1225(b)(2)(A) (emphasis added). Such a proceeding refers to regular removal proceedings before an immigration judge. *See generally* 8 U.S.C. § 1229a.

Accordingly, regardless of whether aliens fall within the B-1 or B-2 class of applicants for admission, aliens apprehended at the border are subject to mandatory detention pending a final determination of their admissibility or adjudication of their asylum claims. Indeed, Justice Alito has stated that the obligation imposed by 8 U.S.C. § 1225(b)(2)(A) is clearly mandatory: "The language of 8 U. S. C. §1225(b)(2)(A) is

unequivocal. With narrow exceptions that are inapplicable here, it provides that every

alien 'who is an applicant for admission' and who 'the examining immigration officer

determines . . . is not clearly and beyond a doubt entitled to be admitted . . . *shall be*

*detained* for a [removal] proceeding." *Biden v. Texas (Texas MPP II)*, 597 U.S. 785, 824

(2022) (Alito, J., dissenting) (emphasis in Alito opinion); *see also Jennings v. Rodriguez*,

583 U.S. 281, 297 (2018) ("Read most naturally, §§ 1225(b)(1) and (b)(2) … mandate

detention of applicants for admission until certain proceedings have concluded.").

        In addition to prescribing the detention and removal of arriving aliens, the INA

also defines the classes of aliens who are removable from the United States. Congress has

specified numerous classes of aliens who are removable from the United States, such as

aliens who enter illegally, commit certain crimes, violate the terms of their status (visa

overstays), obtain admission through fraud or misrepresentation, vote unlawfully, become

a public charge, and whose work would undermine wages or working conditions of

American workers. *See generally* 8 U.S.C. §§ 1182(a) (defining inadmissible aliens) and

1227(a) (defining deportable aliens).

        Immediately upon being sworn into office, the current Administration paused all

removals for 100 days[6] and ultimately adopted an interior enforcement prioritization

policy under the guise of prosecutorial discretion that directs immigration officers not to

---

        [6] *See* DHS memorandum titled "Review of and Interim Revision to Civil
Immigration Enforcement and Removal Policies and Priorities" (Jan. 20, 2021),
https://www.dhs.gov/sites/default/files/publications/21_0120_enforcement-
memo_signed.pdf; *id.* at 3-4 (directing an immediate pause on removals for any alien
with a final order of removal).

take enforcement actions against any alien deemed removable by statute absent additional aggravating circumstances. DHS memorandum titled "Guidelines for the Enforcement of Civil Immigration Law" (Sept. 30, 2021), https://www.ice.gov/doclib/news/guidelines-civilimmigrationlaw.pdf; *see id.* at 2 ("The fact an individual is a removable noncitizen therefore should not alone be the basis of an enforcement action against them."); *id.* at 4 ("Our personnel should not rely on the fact of conviction or the result of a database search alone.").

According to DHS's guidelines, "mitigating factors that militate in favor of declining enforcement action" must be considered before any enforcement action may be taken. The Memorandum listed the following examples of such factors:

- advanced or tender age;
- lengthy presence in the United States;
- a mental condition that may have contributed to the criminal conduct …;
- status as a victim of crime or victim, witness, or party in legal proceedings;
- the impact of removal on family in the Unites states, such as loss of provider …:
- whether the noncitizen may be eligible for humanitarian protection …;
- military or other public service of the noncitizen or their immediate family;
- time since an offense and evidence of rehabilitation;
- conviction was vacated or expunged.

*Id.* at 3-4.

Conversely, the guidelines memorandum states that conviction of a crime alone is not enough to warrant an enforcement action and that aggravating factors must be considered in such cases, such as:

- the gravity of the offense of conviction and the sentence imposed;
- the nature and degree of harm caused by the criminal offense;
- the sophistication of the criminal offense;

• use or threatened use of a firearm or dangerous weapon;
• a serious prior criminal record.

*Id.* at 3.

Defendants' making it discretionary under the Guidelines to detain illegal aliens apprehended at the southern border and who are not expeditiously removed under § 1225(b)(1) or directed to remain in Mexico under § 1225(b)(2)(C) is contrary to the mandatory statutory command that such aliens be detained. *See* 8 U.S.C. §§ 1225(b)(1)(B)(ii) (providing that, if it is determined that an alien has a credible fear of persecution, "the alien shall be detained for further consideration of the application for asylum."); 1225(b)(1)(B)(iii)(IV) ("Any alien subject to the procedures under this clause shall be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed."); 1225(b)(2)(A) ("[I]f the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title."); *see also Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 108-11 (2020) (discussing Congress's expedited removal and detention scheme).

In contravention of these congressional directives, the September 30 Memorandum proclaims that "[t]he fact an individual is a removable noncitizen therefore should not alone be the basis of an enforcement action against them." September 30 Memorandum, at 2. An "enforcement action" described in the September 30 Memorandum includes any determination about whether to continue to detain an alien in a custodial setting or to release such aliens from custody.

Where Congress directs that certain aliens "shall" be detained, Defendant Mayorkas has instructed DHS officers that they "should not" take such action before weighing non-statutory aggravating and mitigating circumstances and concluding that such circumstances are sufficient to warrant action. Under the Guidelines, Defendants are acting contrary to statute by releasing from custody tens to hundreds of thousands of aliens each month after initiating removal proceedings against them by issuing a Notice to Appear ("NTA"). *See*, *e.g.*, https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics-fy2024, under the "U.S. Border Patrol—Dispositions and Transfers" section (showing that DHS released more than 860,000 aliens on their own recognizance in fiscal year 2024 after issuing them a Notice to Appear (NTA-OR)).

Each encounter or apprehension of an alien near the border involves a custodial interrogation and arrest, inasmuch as individual aliens are not free to leave unless and until the immigration officer releases or paroles the alien into the interior of the United States. These detention determinations do not constitute unreviewable exercises of prosecutorial discretion because, at least with respect to aliens being released following the issuance of an NTA, Defendants have made the decision to prosecute such aliens, that is, Defendants have initiated removal proceedings against them.

The Guidelines are contrary the above-listed provisions of federal law by making discretionary the detention of aliens who are already in custody, whereas federal law clearly mandates that Defendants detain such aliens. Because Congress has by statute expressly eliminated the discretion of Defendants not to detain certain aliens, any

11

discretion that Defendants exercise must be consistent with 8 U.S.C. § 1225(b) and could only occur under a provision of federal law expressly authorizing such discretion.

The Guidelines attempt to replace the mandatory detention scheme imposed by Congress in 8 U.S.C. § 1225(b) with a discretionary system created by executive decree. In addition, the guidelines are contrary to law inasmuch as they condition any enforcement action on consideration of aggravating or mitigating circumstances. Congress did not in any way authorize the Executive Branch to redefine the classes of removable aliens or to treat statutory definitions as insufficient to warrant removal. Instead, Congress provided for the consideration of mitigating circumstances through various statutory forms of relief from removal, such as asylum, cancellation of removal, adjustment of status, and various waivers of inadmissibility. The Guidelines are therefore both "not in accordance" with the INA and "in excess of statutory … authority," 5 U.S.C. § 706(2)(A), (C).

*3. Termination of MPP.* Congress has only authorized two exceptions to mandatory detention for illegal aliens. First, Congress has granted DHS the authority to return certain aliens "arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States … to that territory pending a proceeding under section 1229a of this title," 8 U.S.C. § 1225(b)(2)(C). *See generally Texas v. Biden (Texas MPP)*, 20 F.4th 928, 993-98 (5th Cir. 2021) (discussing the alternatives to mandatory detention under section 1225(b)(2)(A)), *rev'd on other grounds*, 597 U.S. 785 (2022). This discretionary authority permits DHS to return certain aliens to contiguous territory in lieu of mandatory detention.

12

There is no question that the government has discretion to exercise its contiguous-territory return authority under § 1225(b)(2)(C). *Texas MPP II*, 597 U.S. at 807 ("[T]he contiguous-territory return authority in section 1225(b)(2)(C) is discretionary—and remains discretionary notwithstanding any violation of section 1225(b)(2)(A)."). But in terminating the MPP Program, Defendants must still comply with the APA and not take arbitrary and capricious actions. 5 U.S.C. § 706(2)(A). A district court has already concluded that DHS likely acted arbitrarily and capriciously in terminating the MPP Program. *See generally Texas v. Biden (Texas MPP Remand)*, 646 F. Supp. 3d 753 (N.D. Tex. 2022). In that case, the district court concluded that Defendants likely acted arbitrarily and capriciously in that they failed adequately to consider or explain: (1) how using contiguous-territory return authority would allow them to avoid violations of the INA's detention mandate; (2) whether DHS's rescission of MPP causes it to violate the limits on its parole authority; (3) several key benefits of MPP; (4) factual determinations regarding in absentia removal orders; and (5) costs and reliance interests. *Id.* at 772-80. This court should decide that the termination of MPP is likely arbitrary and capricious for the same reasons given by the district court in *Texas MPP Remand*.

*4. Parole Programs.* As another exception to mandatory detention for illegal aliens, Congress has conferred upon the DHS Secretary the narrow authority to "parole into the United States temporarily under such conditions as he may prescribe *only on a case-by-case basis* for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States." 8 U.S.C. § 1182(d)(5)(A) (emphasis added). Congress has authorized no other exception to mandatory detention under section

1225(b)(1) and (2). For aliens who are not subjected to the contiguous territory return

provision, the only INA-compliant options are detention pursuant to 1225(b)(1)-(2) or

parole pursuant to 1182(d)(5).[7]

But Defendants have adopted several new parole policies that would allow vast

numbers of aliens with no valid entry documents to enter the country with nominal lawful

status, to receive work authorization, and to become eligible for public benefits. DHS

described the new policies as "additional" "new" "safe, orderly, and lawful pathways to

the United States." DHS Press Release, "DHS Continues to Prepare for End of Title 42;

Announces New Border Enforcement Measures and Additional Safe and Orderly

Processes," released January 5, 2023, available at:

https://www.dhs.gov/news/2023/01/05/dhs-continues-prepare-end-title-42-announces-

new-border-enforcement-measures-and (last visited Oct. 9, 2024). In other words,

Defendants' parole policies are designed to circumvent Congress's immigration policy.

On January 9, 2023, after announcing the creation of a new parole program that

will allow up to 30,000 aliens from Cuba, Haiti, Nicaragua, or Venezuela to enter the

United States each month ("CHNV Parole Program"), DHS published four separate

notices in the Federal Register describing the program. *See* Implementation of a Parole

---

[7]  Pursuant to regulation, parole of aliens subject to mandatory detention under
8 U.S.C. § 1225(b) is governed by 8 C.F.R. § 212.5(b). 8 C.F.R. § 235.3(b)(4)(ii), (c).
Parole of such aliens is limited to those who have serious medical conditions, are
pregnant, are minors, who will be a witness in a judicial, administrative, or legislative
proceeding, or whose continued detention is not in the public interest as determined by an
authorized official. *See* 8 C.F.R. § 212.5(b).

Process for Cubans, 88 Fed. Reg. 1266 (Jan. 9, 2023); Implementation of a Parole

Process for Haitians, 88 Fed. Reg. 1243 (Jan. 9, 2023); Implementation of a Parole

Process for Nicaraguans, 88 Fed. Reg. 1255 (Jan. 9, 2023); Implementation of Changes to

the Parole Process for Venezuelans, 88 Fed. Reg. 1279 (Jan. 9, 2023).

> DHS announced that under the CHNV Parole Program:

> individuals can seek advance authorization to travel to the United States and
> be considered, on a case-by-case basis, for a temporary grant of parole for up
> to two years, including employment authorization, provided that they: pass
> rigorous biometric and biographic national security and public safety
> screening and vetting; have a supporter in the United States who commits to
> providing financial and other support; and complete vaccinations and other
> public health requirements.

January 5, 2023, DHS Press Release. The new CHNV Parole Program "will allow up to

30,000 qualifying nationals per month from all four of these countries to reside legally in

the United States for up to two years and to receive permission to work here, during that

period." *Id.*

In addition to the CHNV Parole Program, DHS also allows inadmissible aliens to

use DHS's CBP One mobile application to schedule an appointment at a port of entry

where aliens without appropriate documents for admission may "present themselves for

inspection and to initiate a protection claim ...." *DHS Scheduling System for Safe,*

*Orderly and Human Border Processing Goes Live on CBP One App*, available at:

https://www.dhs.gov/news/2023/01/12/dhs-scheduling-system-safe-orderly-and-humane-

border-processing-goes-live-cbp-onetm (last visited Oct. 9, 2024). DHS describes the

CBP One app as "part of a number of additional border enforcement measures the

Administration is taking to *expand pathways* for legal immigration ...." (emphasis added)

*Id.* Through the use of the CBP One app, the Biden Administration states that it will "dramatically expand the processing of asylum-seekers along the U.S.-Mexico border by admitting nearly 40,000 migrants" each month (or 1,250 appointments each day). *U.S. plans to admit nearly 40,000 asylum-seekers per month through mobile app*, CBS News, https://www.cbsnews.com/news/asylum-seekers-cbp-one-mobile-app-u-s-plans-admit-nearly-40000-monthly/ (last visited March 7, 2024). DHS subsequently increased the number of appointments to 1,450 per day (or more than 43,000 per month). Press Release, June 30, 2023, CBP One Appointments Increased to 1,450 Per Day, https://www.cbp.gov/newsroom/national-media-release/cbp-one-appointments-increased-1450-day (last visited March 7, 2024).

In addition to the CHNV and CBP One parole "pathways," DHS has created yet another parole program for nationals of Columbia, Honduras, Guatemala, and El Salvador. *See* Implementation of a Family Reunification Parole Process for Colombians, 88 Fed. Reg. 43591 (July 10, 2023); Implementation of a Family Reunification Parole Process for Hondurans, 88 Fed. Reg. 43601 (July 10, 2023); Implementation of a Family Reunification Parole Process for Guatemalans, 88 Fed. Reg. 43581 (July 10, 2023); Implementation of a Family Reunification Parole Process for Salvadorans, 88 Fed. Reg. 43611 (July 10, 2023). Under this Family Reunification Parole Process ("FRP Process"), United States citizens and lawful permanent residents may "request for certain family members to receive advance authorization to travel to the United States to seek parole at an interior [port of entry]." *E.g.*, 88 Fed. Reg. at 43603. "Individuals who are eligible to be considered for parole under this process include nationals of [one of the four

16

countries] who are beneficiaries of an approved Form I–130 family-based immigrant petition, as well as their immediate family members, who are outside the United States and who have not yet received an immigrant visa." *Id.*

DHS describes this FRP process as a "new lawful and flexible pathway[] for tens of thousands of migrants and refugees as an alternative to irregular migration." *Id.* at 43605.[8] According to DHS, "this FRP process could discourage beneficiaries whose immigrant visas are not expected to become available soon from engaging in irregular migration" and "is expected to reduce the number of irregular migrants encountered at the [southwest border], thereby providing a significant public benefit by reducing the strain on border reception and processing capacity, including by diverting the processing of individuals to interior [ports of entries]." *Id.* Aliens paroled into the United States under this FRP process "will generally be paroled for up to three years" and "will be able to request employment authorization while they wait for their immigrant visa to become available and to apply for adjustment of status to that of an LPR once an immigrant visa becomes available to them." *Id.* at 43603.

All of these parole programs are contrary to law because, by using unlawful grants of parole, they are designed to circumvent Congress's detention mandate for illegal aliens apprehended at the border or the regular visa admission process. The current language in

---

[8]  In May, the Administration announced that "it will admit at least 100,000 Latin Americans seeking to reunite with family members in the United States" under the FRP process. US will let in at least 100,000 Latin Americans to reunite with families, https://apnews.com/article/us-immigration-family-reunification-d94cd500548ce5981601737976ab6df3 (last visited Oct. 9, 2024).

section 1182(d)(5)(A), including the "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit" limitation, was added by section 602(a) of IIRIRA "to limit the scope of the parole power and prevent the executive branch from using it as a programmatic policy tool." *Texas MPP*, 20 F.4th at 947. The legislative history leading up to the enactment of IIRIRA reflects Congress's disapproval of the Executive Branch's overuse of its prior parole authority. For instance, a House Judiciary Committee Report complained of "recent abuse of the parole authority" by the Clinton administration in "using the parole authority to admit up to 20,000 Cuban nationals annually." H.R. Rep. No. 104-469, part 1 at 140 (1996). The committee report concluded:

> Parole should only be given on a case-by-case basis for specified urgent humanitarian reasons, such as life-threatening humanitarian medical emergencies, or for specified public interest reasons, such as assisting the government in a law-enforcement-related activity. It should not be used to circumvent Congressionally-established immigration policy or to admit aliens who do not qualify for admission under established legal immigration categories.

Nothing in the INA or relevant regulations authorizes Defendants to "parole aliens *en masse*" or otherwise to release such inadmissible aliens into the United States. *Texas MPP*, 20 F.4th at 997; *see also id.* at 995-98 (noting that the bond-and-conditional-parole provision at 8 U.S.C. § 1226(a) does not apply to aliens subject to detention under section 1225(b)). In short, the congressional scheme is designed to ensure that illegal aliens apprehended at the border are detained until they are either removed or have their asylum claims or removal proceedings fully adjudicated, with narrow exceptions for aliens that present urgent humanitarian reasons or a significant public benefit justifying parole. And

"admit[ing] entire categories of aliens who do not qualify for admission" is precisely what Defendants aim to accomplish through their parole policies.

The CHNV Parole Program alone authorizes 30,000 parolees per month (or 360,000 per year). *See* 88 Fed. Reg. at 1280. In addition, the FRP process allows parole for up to 100,000 aliens per year and more than 800,000 aliens have been paroled into the country over a 20 month period after scheduling an appointment at a port of entry through the CBP One app. *See infra* at 22. Paroling nearly a million aliens per year under Defendants' policies is proof that the Defendants are not employing the parole power on a "case-by-case" basis for only those aliens with compelling humanitarian reasons. These numbers cannot be described as anything other than *en masse*. "Deciding to parole aliens *en masse* is the opposite of case-by-case decisionmaking" *Texas MPP*, 20 F.4th at 942; indeed, "that was the whole point of the 'case-by-case' requirement that Congress added." *Id.* at 997.

Defendants openly declare that the purpose of their parole polices are to establish "new" "safe" and "lawful pathways" for inadmissible aliens to enter the United States. But parole is not intended to replace established immigration channels or to circumvent the pathways established by Congress. Moreover, Defendants' parole programs employ a programmatic, not case-by-case, approach. Congress has already decided on the policies to promote border security and limit irregular migration (mandatory detention and contiguous-territory return along with a narrow exception for parole to be employed only exigent circumstances on a case-by-case basis). Congress enacted these policies into law

19

to prevent the Executive branch from creating its own "safe and orderly pathways" to circumvent the immigration processes established by Congress.

Rather than focus on whether a specific alien's parole would yield a humanitarian or public benefit, Defendants repeatedly measure the alleged public benefits—reduced irregular immigration and reduced strain on DHS resources—by accumulating them across the effect of paroling hundreds of thousands of aliens. For example, Defendants assert that the CHNV Parole Program will "reduce the strain on DHS personnel and resources" at the southern border caused by "record numbers" of aliens from the four covered countries. *See* 88 Fed. Reg. at 1268-69. But assessing the public benefit of paroling each individual alien on a case-by-case basis would never achieve measurable benefits. To be significant, even Defendants acknowledge that parole would have to be done *en masse*. *See* 88 Fed. Reg. at 1280 (cap must be high enough that it "serves as a meaningful alternative to irregular migration" because otherwise "we would then see increased irregular migration" again).

In sum, Defendants' various parole programs are contrary to law because they are not limited to assessing the individualized humanitarian or public benefit that would accrue due to the parole of any specific alien on a case-by-case basis. Instead, the parole programs are designed to circumvent the limits on immigration established by Congress.

**b. The challenged policies have caused the opposite of the effect Congress intended in the immigration laws.**

Contrary to Congress's purpose of preventing, deterring, and detaining illegal aliens, this Administration's policies have resulted in a dramatic increase in the number

of illegal aliens entering the country. According to DHS's own data, prior to the adoption of Defendants' policies, the number of illegal aliens encountered at the southwest border never exceeded 1 million aliens per year. *See* https://www.cbp.gov/newsroom/stats/sw-border-migration/fy-2019 (last visited Nov. 8, 2024). Indeed, the typical number of inadmissible aliens apprehended at the southwest border from fiscal year 2014-2019 amounted to approximately 500,000. *Id.* In fiscal year 2020, the number encountered was just over 400,000. *See* https://www.cbp.gov/newsroom/stats/sw-border-migration-fy2020 (last visited Nov. 8, 2024).

In under two years, these policies have resulted in a dramatic increase, with an estimated 5.5 million illegal aliens' crossing the border from inauguration day in 2021 through fiscal year 2022. *FAIR Analysis: 5.5 Million Illegal Aliens Have Crossed our Borders Since Biden Took Office—How is Secretary Mayorkas Still Employed?*, available at: https://www.fairus.org/press-releases/border-security/fair-analysis-55-million-illegal-aliens-have-crossed-our-borders (last visited Nov. 8, 2024). The number of encounters has only increased since. In fiscal year 2023 alone, Customs and Border Protection ("CBP") encountered over 3.2 million aliens, including nearly 2.5 million at the southwest border. CBP, *Nationwide Encounters*, available at: https://www.cbp.gov/newsroom/stats/nationwide-encounters (last visited Nov. 8, 2024). And there were more than 2.1 million encounters at the southwest border in fiscal year 2024. *Id.* Eighty-five percent of aliens encountered on the southern border, moreover, are released into the United States. Fox News, *Mayorkas tells Border Patrol agents that 'above 85%' of illegal immigrants released into US: sources*, available at:

https://www.foxnews.com/politics/mayorkas-tells-border-patrol-agents-illegal-immigrants-released-into-us-sources (last visited Nov. 8, 2024).

In contrast to the millions of illegal aliens crossing the border each year, Congress has made only 442,000 immigrant visas available for this entire fiscal year. *See* Annual Numerical Limits FY-2024 (estimated), available at: https://travel.state.gov/content/dam/visas/Statistics/Immigrant-Statistics/Web_Annual_Numerical_Limits_FY2024.pdf (showing 226,000 family-based visas and 161,000 employment-based visas available for fiscal year 2024); *see also* 8 U.S.C. § 1151(e) (making 55,000 diversity immigrant visas available annually).[9]

From its inception through September 2024, more than 531,000 people have been paroled into the United States through the CHNV Parole Program. Elliot Spagat, Associated Press, *Border arrests fall in September in last monthly gauge before US elections*, Oct. 22, 2024, available at: https://apnews.com/article/border-arrests-asylum-biden-harris-trump-mexico-690c9f62e600d9afdd7d1cbe2ca96a63 (last visited Nov. 5, 2024). During a similar time period between January 2023 and September 2024, at least 852,000 aliens have been paroled into the United States after scheduling an appointment at a port of entry through the CBP One App. *Id.*; *see also CBP Releases August 2024 Monthly Update*, available at: https://www.cbp.gov/newsroom/national-media-release/cbp-releases-august-2024-monthly-update ("Since the appointment scheduling

---

[9]  The number of family and employment-based immigrant visas available each fiscal year varies depending on the number of visas issued in preceding years and are also subject to a nationality cap. *See generally* 8 U.S.C. § 1151(c)-(d).

function in CBP One™ was introduced in January 2023 through the end of August 2024, approximately 813,000 individuals have successfully scheduled appointments to present at ports of entry instead of risking their lives in the hands of smugglers. … Through the end of August 2024, nearly 530,000 Cubans, Haitians, Nicaraguans, and Venezuelans arrived lawfully on commercial flights and were granted parole under these processes.") (last visited Nov. 8, 2024). In addition, DHS has authorized parole of an additional 100,000 aliens under the FRP process.

These parole policies have not only caused millions of unlawful grants of parole—and thus millions of unlawful entries—by their direct operation, but they have also swollen the flow of other unlawful entries at the border. In the words of a Florida federal district court that struck down one of the Administration's mass-parole programs, the government's "actions were akin to posting a flashing 'Come In, We're Open' sign on the southern border." *Florida v. United States*, 660 F. Supp. 3d 1239, 1253 (N.D. Fla. 2023). Flying in tens of thousands of aliens per month, or letting them come through ports of entry, and releasing them into the country after giving them unlawful grants of parole, especially when combined with the refusal to detain and deport criminal aliens, and even to initiate any sort of proceedings against a whole class of illegal aliens—that is, those presenting no known aggravating factors—sends a powerful message to would-be migrants still abroad that they will be allowed to stay if they can only enter the country. And many so convinced, especially those without cell phones or with criminal records, will decide to make the journey across the border between ports of entry. *See* Declaration of Thomas Homan ("Homan Decl.") at ¶¶ 19, 20. Indeed, in a stark illustration of the

23

magnet effect, only a few days after Donald Trump was elected to a second term as President, and it thus became clear that vigorous enforcement would resume, thousands in a migrant "caravan" heading toward the border in hopes of an electoral victory by Vice President Harris decided to abandon the trip. Daniel Becerril and Lizbeth Diaz, Reuters, *Mexico's migrant caravan breaking up after Trump victory sows uncertainty*, Nov. 7, 2024, available at: https://www.reuters.com/world/us/trump-win-casts-doubt-future-mexicos-migrant-caravan-2024-11-07/ (last visited Nov. 12, 2024).

### c. **Defendants adopted the challenged policies in the full knowledge of their likely effects.**

Defendants' expertise makes it impossible that they did not fully realize the likely consequences of their policies. Given DHS's own conclusion that walls are extremely effective at stopping unlawful entries, it was blatantly obvious that ceasing border-wall construction would cause more unlawful entries. Similarly, since MPP keeps people waiting physically in Mexico—and not in the United States—Defendants cannot possibly claim ignorance that rescinding MPP would result in more illegal aliens in the country.

Nor can Defendants claim ignorance of the magnet effect of their policies, separately and working together. A high-ranking official of DHS, U.S. Border Patrol Chief Raul Ortiz, has admitted to this effect under oath, testifying "based on his experience that there have been increases in migration 'when there are no consequences' and migrant populations believe they will be released into the country," *Florida*, 660 F. Supp. 3d at 1253, and the effect is obvious to all who study the illegal immigration problem. *See* Homan Decl. at ¶ 21. Thus, it could not have been a surprise to Defendants

that the refusal to detain and deport criminal aliens, and even to initiate any sort of proceedings against a whole class of illegal aliens—that is, those presenting no known aggravating factors—and bringing in millions of aliens through unlawful parole programs, especially when combined with ceasing wall building and ending MPP, would send a powerful message that enforcement is lax, and, once here, an illegal alien is very likely to be able to stay indefinitely, and even be able to adjust to lawful status. It thus could not have been a surprise to Defendants that their policies induced millions to cross the border illegally.

### d. The challenged policies are instances of Defendants' failure to take care.

The Take Care Clause provides that the President, and by extension all executive agencies and officials, "shall take Care that the Laws be faithfully executed." U.S. CONST. art. II, § 3. Unconstitutional agency action or inaction violates the Administrative Procedure Act ("APA"), *see* 5 U.S.C. § 706, and can be set aside or enjoined on that basis. In addition, violations of the Take Care Clause are actionable independently of the APA, and this Court can enjoin the Defendants' violations of their Take Care obligations under its inherent equitable powers. *See Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 327-28 (2015) (discussing "a long history of judicial review of illegal executive action, tracing back to England"); *Davis v. Passman*, 442 U.S. 228, 241-44 (1979) (holding that the Constitution itself, coupled with 28 U.S.C. § 1331, provides a cause of action to challenge federal officials who violate the Constitution). The Constitution, moreover, permits anyone with standing to raise equitable claims (and seek injunctive

relief) against federal officers who act unconstitutionally. *Larson v. Domestic & Foreign Comm. Corp.*, 337 U.S. 682, 698-99 (1949); *cf. Ex parte Young*, 209 U.S. 123 (1908).

Furthermore, injunctive relief is the appropriate remedy for take care violations, despite the jurisdictional bar in 8 U.S.C. § 1252(f)(1) that "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter." Though 8 U.S.C. § 1252(f)(1) generally prohibits this Court from enjoining "the operation of" certain provisions of the INA, *see Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022) (holding that § 1252(f)(1) "generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions"), policies that are instances of a failure to take care (such as, for example, a complete failure to execute a statute) are not "operation[s]" of these statutory provisions, but rather the negation of them, and thus Congress did not bar injunctive relief for such constitutional violations in § 1252(f)(1).[10]

Thankfully, violations of the Take Care Clause have been rare in our history. In *Heckler v. Chaney*, the Supreme Court noted that the Take Care Clause would be violated "where it could justifiably be found that the agency has 'consciously and expressly adopted a general policy' that is so extreme as to amount to an abdication of its statutory responsibilities." 470 U.S. 821, 832, 833, n.4 (1985) (quoting *Adams v. Richardson*, 480

---

[10]   In any event, Defendants' border wall and parole policies are not covered by § 1252(f)(1), and this Court has jurisdiction to enjoin them.

26

F.2d 1159, 1162 (D.C. Cir. 1973) (en banc)). The Court has also held that the executive

lacks the power to dispense with the operation of a law. *Office of Pers. Management v.*

*Richmond*, 496 U.S. 414, 435 (1990) ("The Executive Branch does not have the

dispensing power on its own … and should not be granted such a power by judicial

authorization.") (citing *Stokes*, 37 U.S. at 613).

In the face of the Administration's border policies, the Fifth Circuit has recently

provided fuller guidance on the applicability of the Take Care Clause. In *Texas MPP*, the

Fifth Circuit explained how the Take Care Clause is a limit on executive powers and

precludes the executive branch from suspending or dispensing with the law. *See* 20 F.4th

at 978-82; *id.* at 979 (describing the power to suspend a law as "the power to set aside the

operation of a statute for a time" and the power to dispense with a law as "the power to

grant permission to an individual or a corporation to disobey a statute") (internal

quotation omitted); *id.* at 978-83 (discussing how the Take Care Clause incorporates the

common law prohibition against suspending and dispensing powers and concluding that

"the Constitution[] explicitly forb[ids] the executive from nullifying whole statutes by

refusing to enforce them on a *generalized* and *prospective* basis") (emphasis in original).

Given the obvious purpose of the Take Care Clause—to make Congress's

legislative power a reality by requiring the executive to execute the laws faithfully—it is

clear why dispensing with the law and suspending it are both failures to take care. If the

executive were able to dispense with or suspend the law, it could deprive Congress of its

legislative power as it saw fit. *See, e.g., Stokes*, 37 U.S. at 613 ("[V]esting in the

President a dispensing power . . . would be clothing the President with a power entirely to

control the legislation of congress"). Likewise, Congress can be deprived of its power to legislate if the real-world effects it intends to achieve, on the presumption that its laws will be executed faithfully, are subverted by otherwise-unlawful policies calculated to achieve the opposite of these effects. Such executive maneuvers to thwart the law's purposes are the antithesis of its faithful execution. In other words, the executive could equally make Congress impotent by failing altogether to execute the law (*Heckler*), by dispensing with or suspending the law (*Texas MPP*), or by unlawful policies calculated to achieve the opposite of what Congress sought to achieve in the law—were the Take Care Clause not standing in the way.

In short, by adopting the challenged policies, which are in themselves unlawful, in the full knowledge that they would likely result (as they have resulted) in the opposite of Congress's purposes in passing the laws these policies purportedly implement, Defendants have violated their constitutional duty to take care that the laws be faithfully executed.

## II.     The challenged policies are causing Plaintiffs irreparable harm.

Defendants' abdication of their duty to take care substantially injures Plaintiffs in a concrete and particularized way that will be redressed by the injunctive relief sought here, giving rise both to Plaintiffs' standing to bring this action and irreparable harm. As a result of Defendants' policies, since early 2021, millions of inadmissible aliens have been induced to travel to the United States and have been released into the interior of the United States, rather than being detained or required to remain in Mexico.

Plaintiffs Sheriff Coe and Kinney County have suffered concrete and direct injuries caused by Defendants' unlawful policies. In Kinney County, there has been a massive increase in the number of crimes committed by illegal aliens that began immediately following the implementation Defendant's unlawful policies. In 2020, prior to the implementation of Defendants' policies, Sheriff Coe apprehended a total of 180 illegal aliens in Kinney County. Declaration of Kinney County Sheriff Brad Coe ("Coe Decl.") at ¶ 9. But after Defendants' policies were enacted, the number of illegal aliens apprehended in Kinney County skyrocketed. In 2021, 1,121 illegal aliens were apprehended in Kinney County, and that number rose to 3,055 in 2022 and 2,126 in 2023. The number of apprehensions remained elevated in 2024, with more than 550 apprehensions thus far in 2024.[11] *Id.* The number of alien smugglers arrested in Kinney County mirror this increase in illegal-alien arrests. Forty seven smugglers were arrested in 2020; 188 in 2021, 329 in 2022, and 643 in 2023. *Id.* at ¶ 10. And so far in 2024, at least 114 smugglers have been arrested to date. *Id.*

Plaintiffs Sheriff Coe and Kinney County bear the financial costs of investigation, arrest, and detention caused by this increase in crime. Although the State of Texas reimburses the counties for some of the costs relating to the increase in crime due to

---

[11]  These numbers are confirmed by the criminal data reported to the Texas Criminal Justice System (CJIS). In 2020, Kinney County reported 134 criminal charges to CJIS. Declaration of Kinney County at ¶ 4. That number rose to: 2,710 criminal charges in 2021; 6,796 in 2022; and 5,850 criminal charges in 2023. *Id.* "The vast majority of these crimes have been committed by illegal aliens and human smugglers who have taken advantage of [Defendants'] unlawful immigration policies." *Id.*

Defendants' policies, Sheriff Coe's office incurred more than $50,000 unreimbursed law enforcement and detention costs in 2022 alone, and since February 2021, Sheriff Coe has incurred $243,085 in unreimbursed expenses relating to housing illegal aliens and smugglers in out-of-county facilities. Coe Decl. at ¶14. These costs are directly attributable to Defendants' enforcement policies inasmuch as Defendant ICE has informed Sheriff Coe that ICE will not accept any illegal alien convicted of criminal trespass because they do not meet the criteria for removal under Defendants' policies. *Id.* at ¶¶ 16, 18. Defendants' failure to remove such aliens leaves them free to commit additional crimes after they are released from custody. *Id.* at ¶ 21.

In addition to law enforcement costs, Plaintiff Kinney County has incurred over $450,000 in expenses since January 2021 directly related to border related calls to Kinney County Emergency Medical Services (KCEMS). Declaration of Kinney County at ¶ 6. That number includes the following:

- $139,000 for providing emergency medical services to illegal aliens or human smugglers

- $307,000 for overtime costs for necessary personnel required to address the drastic rise in call volume due to the influx of illegal aliens and smugglers

- $4,200 for additional fuel costs

*Id.* These expenses are above and beyond what Texas has reimbursed or will reimburse the County through Operation Lone Star or other programs.

The total monetary costs to Plaintiffs Sheriff Coe and Kinney County amounts to more than $800,971. *Id.* at ¶ 7. This includes more than $341,000 in unreimbursed expenses for Sheriff Coe's office and over $450,000 in KCEMS expenses. *Id.* at ¶¶ 5-7.

The most significant cost, however, is not monetary:

> On three occasions, taxpaying residents of Kinney County have passed away while all emergency medical services (EMS) were responding to human smuggling events, leaving them without any emergency medical care in their time of need. In the most recent occasion this year, one long time county resident suffered a severe stroke and was unresponsive. Unfortunately, all available EMS resources were already responding to a vehicle rollover caused by an attempted human smuggling event, leaving the stroke victim without any available emergency medical care.

*Id.* at ¶ 8. EMS was requested from a neighboring county, but there was a lengthy delay in receiving lifesaving medical treatment. *Id.*

### III.    The balance of equities and the public interest favor an injunction.

This Court should consider the balance-of-equities and public-interest elements together. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (merging these two elements when the Government is the nonmoving party); *Texas v. United States (Texas DAPA)*, 809 F.3d 134, 187 (5th Cir. 2015) (same). This Court should weigh whether "the threatened injury outweighs any harm that may result from the injunction to the non-movant" and whether "the injunction will not undermine the public interest." *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1051, 1056 (5th Cir. 1997).

The balance of harms favors granting a preliminary injunction because Plaintiffs' harm is immediate, irreparable, and continuing. Plaintiff counties also have a significant interest in maintaining the health and safety of their residents. Conversely, Defendants

have no legitimate interest in implementing unlawful policies. Also, the public interest is served when the law is followed, and "there is generally no public interest in the perpetuation of unlawful agency action." *Wages & White Lion Invs., LLC, v. U.S. Food & Drug Admin.*, 16 F.4th 528, 560 (5th Cir. 2021) (quoting *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)). In short, the balance of equities and public interest weigh in favor of an injunction.

Finally, a nationwide injunction is appropriate in this case. "In the context of immigration law, broad relief is appropriate to ensure uniformity and consistency in enforcement." *Texas v. United States*, 40 F.4th 205, 229 n.18 (5th Cir. 2022). And "[t]here is a substantial likelihood that a geographically-limited [remedy] would be ineffective," as illegal aliens would simply be released or paroled into the United States at another location and not subjected to removal under the unlawful guidelines. *Id.*; *see also Texas DAPA*, 809 F.3d at 187-88 (stressing the importance of "uniform" immigration laws).

## CONCLUSION

For the foregoing reasons, the Court should enter a preliminary injunction enjoining Defendants from implementing or from continuing to implement the challenged policies, programs, processes, or actions.

Respectfully submitted,

/s/ Christopher J. Hajec
CHRISTOPHER J. HAJEC
D.C. Bar No. 492551
*Lead Counsel*

MATT A. CRAPO
D.C. Bar No. 473355
Immigration Reform Law Institute
25 Massachusetts Ave., NW, Suite 335
Washington, D.C. 20001
(202) 232-5590
chajec@irli.org
mcrapo@irli.org

*Attorneys for Plaintiffs*

**CERTIFICATE OF CONFERENCE**

I certify that on November 13, 2024, I contacted Defendants' counsel via email to ascertain Defendants' position with respect to the forgoing motion for preliminary injunction. Defendants informed me that they oppose this motion.

/s/ Christopher J. Hajec
CHRISTOPHER J. HAJEC

**CERTIFICATE OF SERVICE**

I certify that on November 14, 2024, I filed this motion through the Court's CM/ECF system, which served it on all counsel of record.

/s/ Christopher J. Hajec
CHRISTOPHER J. HAJEC