IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | |
|---|---|
| MICHAEL L. VICKERS, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> JOSEPH R. BIDEN, JR., President, in his official capacity, *et al.*, <br><br> Defendants. | Civil Action No. 2:24-cv-00169 |

## Declaration of Thomas Homan

I, Thomas Homan, hereby declare:

1. I reside in Fredericksburg, Virginia, am a United States citizen more than 18 years of age, and am fully competent to testify in a federal court.

2. I am the former Acting Director of U.S. Immigration and Customs Enforcement (ICE), U.S. Department of Homeland Security (DHS), a position I held from January 2017 to June 30, 2018.

3. I have over thirty years of experience working for ICE and its predecessor entity, the Immigration and Naturalization Service (INS).

4. I hold a Bachelor of Science degree in Criminal Justice from the State University of New York Polytechnic Institute (formerly SUNYIT) at Utica-Rome.

1

5. I am a 34-year veteran of law enforcement, having begun my career as a police officer in New York in 1983. In 1984, I became a U.S. Border Patrol Agent with the former Immigration and Naturalization Service (INS) in Campo, California. In 1988, I became an INS Special Agent in Phoenix, Arizona, and was later promoted to Supervisory Special Agent and Deputy Assistant Director for Investigations. In 1999, I became the Assistant District Director for Investigations (ADDI) in San Antonio, Texas, and three years later transferred to the ADDI position in Dallas, Texas.

6. The INS was abolished by the Homeland Security Act of 2002, and ICE was created to perform many of its former enforcement functions, along with the investigative functions of the former U.S. Customs Service.

7. Upon the creation of ICE in March 2003, I was named the Assistant Special Agent in Charge in Dallas, Texas. In August 2004, I was named the Deputy Special Agent in Charge (DSAC) in that same office. As DSAC, I directed the day-to-day operations of seven local offices, with more than 200 special agents and support personnel, conducting investigations related to terrorism, export enforcement, illicit financing, money laundering, human trafficking, intellectual property rights violations, and cybercrimes.

8. In March of 2009, I became Enforcement and Removal Operations (ERO) Assistant Director for Enforcement at ICE Headquarters. In that position, I was responsible for ICE's enforcement initiatives and components through which ERO identifies and arrests removable aliens, including the Criminal Alien Program, the National Fugitive Operations Program, Field Training, the 287(g) Program, the Law

Enforcement Support Center, the Fugitive Operations Support Center (now the National Criminal Analysis and Targeting Center), the Detainee Enforcement and Processing Offenders by Remote Technology Center, and the Interoperability Response Centers. In October of the following year, I was promoted to Deputy Executive Associate Director for ERO, and in May 2013, I was promoted to Executive Associate Director for ERO, a position I held until January 2017.

9. From November 2017 to 2018, I held the position of Deputy Director and Senior Official Performing the Duties of the Director of ICE. From January 2017 until June 30, 2018, I served as Acting Director of ICE. In both positions, I directly oversaw ICE's core operational programs, as well as the agency's managerial and administrative support functions.

10. I subsequently authored a book about the problem of illegal immigration and solutions titled Defend the Border and Save Lives: Solving Our Most Important Humanitarian and Security Crisis (Center Street 2020). Following President Trump's election to the presidency for a second term, he has announced that I will act as his administration's "Border Czar," in charge of the nation's borders and deportation efforts.

11. I make this declaration on the basis of my own personal and professional knowledge and experience, as well as information available to me in my positions in public service.

12. On January 20, 2021, inauguration day, President Biden issued an executive order directing an immediate pause in wall construction projects, and DHS announced suspension of the MPP program.

13. DHS also issued a memorandum ("January Memo") in which it announced an immediate 100-day pause of all removals of removable aliens and limited post-pause immigration law enforcement priorities to three categories: (1) National Security (limited to terrorists, spies, or other serious security threats); (2) Border Security (limited to illegal aliens who entered the United States after November 1, 2020); and (3) Public Safety (limited to aliens who have been convicted of an aggravated felony).

14. On February 18, 2021, ICE issued an interim guidance memorandum largely reiterating the enforcement priorities set forth in the January Memo while imposing a new preapproval requirement for non-priority enforcement actions. Under the interim guidance, immigration officers were required to make a written proposal and obtain preapproval from supervisory personnel before taking an enforcement action against a non-priority alien.

15. On September 30, 2021, DHS Secretary Mayorkas issued a memorandum establishing final guidance for immigration enforcement ("Final Memorandum"). In the Final Memorandum, Secretary Mayorkas retained the general priority categories first established in the January Memo, but eliminated any presumption that enforcement action is warranted against aliens who fall within a priority category. Instead, the Final Memorandum states that DHS "personnel must evaluate the individual and the totality of the facts and circumstances and exercise their judgment accordingly," and that "[w]hether a noncitizen poses a current threat to public safety is not to be determined according to bright lines or categories, [but by] an assessment of the individual and the totality of the facts and circumstances."

16. As a matter of practice, many arrests are made on little notice and on the streets. Thus, in my opinion, the requirement, even in "priority" cases, that an agent undertake an intensive investigation of "the totality of facts and circumstances" not ascertainable from a quick database search before taking any routine enforcement action will result in drastically fewer arrests; the typical arrest cannot be delayed for such an extensive investigation.

17. Also, the Final Memorandum provides that "[t]he fact an individual is a removable noncitizen therefore should not alone be the basis of an enforcement action against them." Thus, absent some aggravating factors, aliens previously defined as removable by Congress and subject to enforcement action at any time are now made un-removable under the Final Memorandum.

18. The pause in wall construction, termination of MPP, and DHS's enforcement memoranda (especially the language just mentioned), have resulted in historic illegal immigration on the southern border. In FY2021 there were over 1.7 million illegal crossings; in FY2022 that number increased to more than 2.3 million; and in FY2023, CBP recorded more than 2.4 million encounters at the Southwest border and more than 3.2 million encounters nationwide. In FY 2024, CBP encountered more than 2.1 million illegal aliens at the Southwest border and more than 2.9 million nationwide. This represents four years of historic highs.

19. In addition to dismantling effective enforcement policies, DHS, in January 2023, announced new parole processes to facilitate the flow of and increase the number of aliens released unlawfully into the United States. DHS describes these parole

processes as "additional" "new" "safe, orderly, and lawful pathways to the United States." These new parole processes (including the CHNV Parole Program, the CBP One application process, and the FRP Process) grant aliens paroled into the United States lawful status and permit them to obtain work authorization. These parole programs thereby act as a magnet to inadmissible aliens and signal a willingness to normalize or whitewash illegal immigration.

20. In my opinion, these increases are in large part because the government's abdication of its duty to enforce the immigration laws has sent a clear message to potential illegal border-crossers that effective enforcement policies have been largely abandoned. Coupled with the government's newly-created parole "pathways" and the accompanying benefits, the government has sent a clear message that illegal entries will not only not be punished but rewarded. Mere unlawful presence has been declared insufficient to warrant DHS action, and, in practice, only extremely dangerous criminal aliens have the potential to face deportation. From my experience in immigration enforcement, including my time in charge of ICE, it is clear that those who desire to cross our border illegally respond to incentives such as the ones described herein. Consequently, I have no doubt that the actions challenged in this case have contributed substantially to the increased influx of illegal aliens over our southern border from February 2021 to the present.

21. I also believe that the current administration and the Defendants in this case knew that these policies would have this effect. It is well understood throughout the immigration law enforcement community that would-be border crossers abroad watch

6

carefully what border officials say and do, and will respond to lax enforcement by attempting to enter illegally. Defendants, too, could not have been ignorant of this effect, and I have no doubt that they were fully aware of the likely consequences of their policies.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 14th day of November 2024 in Washington, D.C.

_____
Thomas Homan